FILED
2009 Jul-06  PM 03:07
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KAREN ANN ISHEE PARSONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **CV-09-B-0267-S** |
| **BRIGHTHOUSE NETWORKS, LLC,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff and class representative, Karen Ann Ishee Parsons, states the following as her First Amended Class Action Complaint ("FAC") against defendant Brighthouse Networks, LLC ("BHN"):

## INTRODUCTION

1.  Years ago, telephone companies insisted that it was proper and necessary that their customers' only choice in home telephones were those leased to the customer by the telephone company.  Long after that practice was banned as abusive and anticompetitive, BHN continues that profitable, but illegal, practice with its cable boxes.

2.  Plaintiff brings this class action on behalf of all persons who have subscribed to Premium Cable Services[1] from BHN and have been compelled to pay cable box rental fees to BHN.  BHN sells tiers of cable television services.  At the most basic level of service, the cable may be connected directly to modern television sets without the need of additional equipment.  However, for Premium Cable Services, for which BHN charges additional fees, additional equipment is required to allow the customer to receive the service.  Although this practice has been determined to be anticompetitive and detrimental to consumers, BHN has engaged in various tactics to continue to control the cable box options available to its customers and to continue to enjoy the revenue stream created by its unlawful conduct.

3.  BHN does not manufacture cable boxes; it purchases them from two principal suppliers.  BHN will not permit a customer to acquire ownership of a cable box either from BHN or the manufacturer.  As alleged in more detail herein, BHN has restrained trade in cable boxes so that BHN is the exclusive source of cable boxes for its customers.  BHN has used this restraint of trade to extract

---

[1]The term "Premium Cable Services" is defined at paragraph 23 herein, using the terminology employed in BHN's explanation of its cable practices.

additional revenues from premium cable customers by charging monthly cable box rental fees in addition to the fees it charges for the Premium Cable Services.

4.  Plaintiff brings this case as representative of a class of BHN premium cable customers described more completely below, alleging that BHN's past and present actions constitute an impermissible restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Sherman Act").  The activities of BHN have and will continue to threaten to have substantial adverse competitive effects upon interstate commerce and inflict direct economic injury upon the Plaintiffs.

## THE PARTIES

5.  Plaintiff Karen Ann Ishee Parsons is a citizen of the State of Alabama, is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.  At all relevant times Ms. Parsons has been a subscriber to Premium Cable Services provided by BHN.

6.  Defendant BHN is a Delaware Limited Liability Corporation with its principal place of business in Stanford, Connecticut, registered to do business in Alabama.

7.  BHN currently provides cable video programming services and leases cable boxes in communities, or clusters of communities, in several states.  BHN

represents that it provides cable services in the following communities:

> Cantonment, Florida
> Defuniak Springs, Florida
> Central Florida (Orlando)
> Tampa Bay, Florida
> Birmingham, Alabama
> Elmore County, Alabama
> Eufaula, Alabama
> Bakersfield, California
> Indianapolis, Indiana
> Metro Detroit, Michigan

For ease of reference, the geographical locations where BHN does business are articulated herein in terms of the community or communities they serve.  In reality, the actual geographic boundaries of the markets that BHN operates in, and controls are bounded by exclusive local franchises granted by local governing authorities (municipalities, counties, or other local governmental subdivisions) to offer cable television services BHN receives easements in which to operate its infrastructure.  In turn, BHN pays the franchise granting political subdivision a franchise fee collected from subscribers within the franchise area based upon revenues received from cable subscription fees.

8.  BHN's unlawful business practices, as detailed herein, are uniform within the markets in which BHN sells its services.

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § § 1331 and 1337, in that Plaintiff, on behalf of herself and the members of the Class, assert claims under the Sherman Act, 15 U.S.C. § 1.

10.  Venue is proper in this Court under 28 U.S.C. § 1391 and 15 U.S.C. § 22 because a significant portion of the events, acts, and omissions giving rise to this action occurred in the District, and Defendant resides, transacts business, or is found within this District.

## CLASS ACTION ALLEGATIONS

11.  Plaintiff brings this class action lawsuit on behalf of herself and the Class pursuant to Federal Rules of Civil Procedure 23(b )(1), (2) and (3).

12.  Plaintiff brings this class action on behalf of herself and the following class of persons for claims arising under federal law:

> All persons in the United States who subscribed to BHN for Premium Cable Services and paid a monthly rental fee for an accompanying cable box.

> Excluded from the Class are those BHN customers who receive service at an address at which they may receive cable television service from at least one competing cable or fiber optic vide service provider in addition to BHN; however, this exclusion shall only apply as of the date such competing service became available and does not defeat such class members' right to a remedy for

5

injuries suffered prior to the existence of such
competition.

Excluded from the Class are BHN officers, directors or
employees of BHN; any entity in which BHN has a
controlling interest; the affiliates, legal representatives,
attorneys, heirs, or assigns of BHN; and any federal,
state, or local governmental entity, and any judge,
justice, or judicial officer presiding over this matter and
the members of their immediate families and judicial
staffs.

13.  The requirements of Rule 23, including the numerosity, commonality,

predominance, typicality, adequacy and/or superiority elements are all satisfied.

14.  <u>Numerosity</u>: The members of the proposed Class and of each Subclass

are so numerous that joinder of all members is impracticable.  The proposed Class

includes thousands of members.  The precise number of members of the Class can

be easily ascertained through discovery, which will include Defendant's sales and

other records.

15.  <u>Commonality/Predominance</u>: There is a well-defined community of

interest and common questions of law and fact which predominate over any

questions affecting only individual members of the Class.  These common legal

and factual questions, which do not vary from one class member to another, are

based on Defendant's uniform treatment of members of the proposed Class and

Subclasses, and which may be determined without reference to the individual

circumstances of any class member, include, but are not limited to the following:

    (a)   Whether BHN is liable to Plaintiff and the
Class for violations of federal antitrust laws;

    (b)   Whether BHN has established illegal tying
arrangements for the rental of cable boxes, in
violation of federal law;

    (c)   Whether BHN's actions caused injury to
Plaintiff and the Class and whether BHN
should be enjoined from further violations; and

    (d)   Whether BHN is liable to Plaintiff and the
Class for treble damages for its violation of
federal antitrust laws.

16. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of

the Class.  Plaintiff and all class members have been injured by the same wrongful

practices in which Defendant has engaged.  Plaintiff's claims arise from the same

practices and course of conduct that give rise to the claims of the class members

and are based on the same legal theories.

17. <u>Adequacy</u>: Plaintiff who will fully and adequately assert and protect the

interests of the Class and the Subclasses, and have retained class counsel who are

experienced and qualified in prosecuting class actions, and, specifically, antitrust

class actions.  Neither Plaintiff nor her attorneys have any interests which are

contrary to or conflicting with the Class.

7

18. <u>Superiority</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all Class and Subclass members is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each class member resulting from Defendant's wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual class members prosecuting separate claims is remote, and even if every class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgment and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the Class would be proper.  Defendant has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or

8

corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

## FACTUAL ALLEGATIONS

19.  BHN provides cable services to customers in selected communities in several states as set forth in paragraph 7 above.  Cable service providers are sometimes referred to as cable multichannel video programming distributors ("MVPDs").

20.  BHN's past and present conduct described herein allows it to unfairly utilize its market power and/or economic power in the cable television markets controlled by BHN to compel the Class to acquire necessary cable boxes solely through rental from BHN, thereby harming members of the Class by removing competition for the retail sale of cable boxes.

The Tying and Tied Products.

21.  BHN's cable programming is offered to consumers based upon tiers of service.  At the least expensive level of service, customers receive a limited number of local and national channels for a monthly fee.  This is known as "basic cable."  Modern television sets are sold as "cable ready" - *i.e.*, the television can receive basic cable simply by attaching the television to a cable connected to the cable MVPD system.  Television sets which are not manufactured as "cable ready"

9

units also require the use of a cable box.  However, due to the availability of "cable ready" televisions in the market, customers who rent a cable box but receive only basic level service are not included in the Class.

22.  Customers desiring more choice in video programming can, for an additional monthly fee, subscribe to BHN's Premium Cable Services and pay an increased monthly fee to BHN.  Members of the Class are BHN customers who elect to receive premium channels such as HBO, Showtime, and other specialty channels and video programming services not included in the basic cable programming.

23.  For purposes of this Complaint, "Premium Cable Services" is defined as those cable video services, which are not available to customers by simply plugging a cable into a cable-ready television.  This definition includes all scrambled or otherwise secured video channels, as well as "pay per view" or "on demand" cable video programming, for which BHN charges fees other than the fee for basic cable, but may only be viewed through the use of a cable box.

24.  According to the most recent Federal Communications Commission ("FCC") annual report on competition in the industry, as of 2005, there were approximately 96.9 million subscriptions for Premium Cable Services sold by

10

cable MVPDs (including, but not limited to, BHN) in the United States.  BHN is the sixth largest MVPD in the country.

25.  The Premium Cable Services offered by BHN are the "tying product."

26.  In addition to paying a fee for cable television, customers that pay for Premium Cable Services must also pay a rental fee to BHN for a cable box, sometimes referred to as a "set-top box."  The cable box in its simple form serves two functions.  First, the cable box allows the consumer to receive video signals and to navigate among the channels carried on a particular cable system.  The second function is a cable descrambler or "conditional access device" which controls the security features for premium channels to ensure that customers do not receive Premium Cable Services for which they have not paid.

27.  The "tied product" is the cable box BHN rents to consumers, for an additional monthly fee, to enable them to utilize BHN's Premium Cable Services.  For purposes of this pleading, the term "cable box" also includes the dedicated remote-control for such cable box, whether or not BHN also charges a separate fee for the rental of the remote control.  For purposes of this pleading, the term "cable box" also includes cable boxes which include features in addition to those required to perform the basic navigation and security functions, including, but not

11

limited to cable boxes which have an additional functionality as a Direct Video Recorder ("DVR").

28.  The tying product and the tied product are separate and distinct products.  BHN does not design or manufacture the cable box.  BHN merely purchases the mass produced cable boxes from the manufacturer and compels its Premium Cable Services customers to rent the cable boxes from BHN.

29.  Although cable boxes are manufactured, or would be capable of manufacture, by numerous entities, upon information and belief, the market has been historically dominated by just two suppliers, Scientific Atlanta (a subsidiary of Cisco Systems, Inc.) and Motorola, Inc., both of which work under contract with BHN and supply cable boxes to BHN.  Upon information and belief, neither Scientific Atlanta, nor Motorola, will sell these cable boxes to the general public.

Coercion to Purchase the Tied Product.

30.  BHN requires class members to rent a cable box directly from BHN and from no other source besides BHN.  Thus, BHN ties its Premium Cable Services to the cable box that it requires class members to rent.

31.  Prior to July 1, 2007, the only cable boxes recognized as permissible by BHN were those rented to consumers by BHN.  BHN would not provide the Premium Cable Services unless the customer also rented a cable box from BHN.

However, as explained below, even after July 1, 2007, BHN, as a practical matter, continues to require consumers to acquire cable boxes only through BHN and denies consumers the benefits of a competitive market in these devices.

32.  BHN's practice of requiring consumers to rent a cable box from BHN to the exclusion of any other source was recognized as an anticompetitive practice. Congress enacted 47 U.S.C. § 549, Section 629 of the Communications Act of 1954, directing the FCC to adopt regulations:

> to assure the commercial availability, to consumers of multichannel video programming and other services offered over multichannel video programming services [i.e. cable companies] of converter boxes, interactive communications equipment and other equipment used by consumers to access multichannel video programming and other services offered over multichannel video programming systems, from manufacturers, retailed and other vendors not affiliated with any multichannel video programming distributor.

33.  Pursuant to 47 U.S.C. § 549, in 1998, the FCC, in an effort to stop the anticompetitive practices described herein, directed the cable industry to make the security elements of a cable box available separately from the channel navigation aspects of a cable box (sometimes also called "host devices"), so that a free and open market for such cable boxes could be developed by consumer electronic retailers.  The cable industry was given until January 1, 2005 to make available a

separate security element (referred to as a "point of deployment module" or "POD") which would provide the security element of the cable box separately from the navigation device.

34.  The cable and consumer electronics industries use the common name "CableCARD" to refer to the POD security devices compelled by the FCC.

35.  BHN and other MVPDs were successful in delaying the effective date of the regulation from January 1, 2005, until July 1, 2007.

36.  BHN's control of the delivery of Premium Cable Services in the markets in which it does business enables BHN to control the security mechanisms and navigation technology used in its systems.

37.  BHN has used its control over the geographic markets in which it does business to inhibit and thwart the effectiveness of CableCARD technology and to preserve its ability to coerce to its customers into continuing to acquire cable boxes solely by rental from BHN in a non-competitive market.

38.  Manufacturers of consumer electronic products who desire to enter into the market for cable boxes, have repeatedly complained that BHN and other cable companies have engaged in practices to prevent the CableCARD from becoming an effective option for consumers who no longer wish to pay rental fees for cable boxes.  For example, in December, 2006, the Consumer Electronics Association

14

("CEA") sent a lengthy objection to the FCC concerning the practices of cable MVPDs (including BHN) which were thwarting the implementation of CableCARD and preventing consumer electronics manufactures from competing in the cable box market.  The existence of the CableCARD has not produced the intended result of introducing competition into the market for cable boxes.

39.  Even though CableCARDs are manufactured by companies other than BHN, BHN represents to consumers thought its website that they are only available through BHN for a monthly rental fee.

40.  The monthly rental fee, and other fees bundled with a CableCARD, are greater than the fees charged for a cable box.

41.  Not only are the fees for a CableCARD higher than those for a cable box, but, even though the technology exists such that the CableCARD perform the same function as a cable box, BHN has limited the effectiveness of CableCARDs, making it highly unlikely that even the relatively few consumers owning hew televisions with CableCARD capabilities would choose to rent the CableCARDs from BHN.

42.  In addition to pricing the CableCARDs higher than cable boxes, BHN limits the functionality of CableCARDs in the following ways:

- CableCARDs do not allow consumers to order advanced services such as pay-per-view events or premium sports packages;

- CableCARDs do not provide the channel guide services of cable boxes;

- CableCARDs are not enabled to provide two-way services such as the interactive program guide, or certain pay-per-view events.

43.  These limitations severely limit the desirability of CableCARDs, so that consumers will have no real choice but to rent a cable box from BHN.

44.  Despite the FCC mandated creation of CableCARD technology, BHN continues to limit the employment of that technology and continues to require consumers of its Premium Cable Services to continue to rent their cable boxes from BHN as a requirement of receiving the Premium Cable Services for which they pay.  As a result of BHN and other MVPD's actions, CableCARD technology has not been widely adopted or marketed by consumer electronic manufacturers. Why would someone want to pay more for a product that does less?

45.  As further evidence of BHN's intent and ability to prevent the CableCARD technology from diminishing its control over the cable box market, BHN has preserved its position as the sole supplier of cable boxes to its customers

by implementing technology which renders the CableCARD technology useless, or impairs its utility, unless the customer also is renting a cable box from BHN.

46.  Despite the requirements of federal law, BHN continues to require consumers to acquire their cable box only by renting from BHN.

<u>Economic Power in the Tying Product Market</u>.

47.  BHN is the sixth largest cable MVPD in the United States.

48.  Cable MVPDs, including BHN, do not normally compete against each other, but operate in geographically divided local markets.  Generally, Plaintiff - and all other current and potential cable television subscribers in a BHN market - have no choice but to contract with BHN for cable service.  Accordingly BHN has *de facto* monopoly power in many areas in which it provides cable television services or otherwise has sufficient market power to appreciably restrain free competition as alleged herein.  Indicative of such monopoly power, o ver the last decade, average cable prices paid by consumers have risen by 93%, or three times the inflation rate over the same period.

49.  In those markets controlled by BH, BHN's control over all cable television services naturally gives BHN control over Premium Cable Services.  Although the tiers of service are vertically differentiated, Premium Cable Services

17

rely upon the same basic infrastructure, with the addition of the cable box in the customer's home.

50.  According to the Thirteenth Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, issued by the FCC on January 19, 2009 (the "FCC Assessment"), although video programming is distributed by means other than cable, most notably broadcast and satellite services, cable MVPD is the dominant force in the market, and enjoys a nationwide market share of almost 70%.  A Congressional research report in 2007 found that cable controlled 69% of the nationwide MVPD market, compared to 27.7% for direct satellite transmission.  Moreover, any nationwide statistic on cable vs. Satellite MVPD competition under-represents BHN's competitive position in the markets in which it chooses to do business, in that satellite MVPD services are available in areas in which no cable television service is available. Conversely, in urban areas, the physical requirements required to receive satellite MVPD services (an external surface with a clear sight line to the sky on which to attach a satellite dish) are harder to find, and often specifically foreclosed to tenants and apartment owners by landlords and/or condominium or cooperative rules.  The difficulty in meeting the physical requirements for receiving satellite MVPD services further limits the competitive pressure of satellite services upon

cable services.  Thus, a 2005 general accounting office ("GA") study found that satellite MVPD market penetration was only 13% in urban areas, compared to 29% in rural areas.

51.  In addition to BHN's claimed superiority in service and reliability over satellite MVPD services, BHN enjoys a competitive advantage over such services by its ability to "bundle" its MVPD services with broadband internet access and phone service, provided over the same cable facilities.  Because broadband internet access and phone service are not available through satellite MVPD technology, BHN enjoys a competitive advantage over satellite MVPDs in those areas in which BHN does business.

52.  Moreover, in those markets in which BHN does business, it has a further advantage as the incumbent service provider in that switching from BHN cable to another MVPD provider, whether an overbuilder, an incumbent phone company or a satellite MVPD, carries inherent costs to the consumer, including equipment acquisition and time, which must be weighed against whatever benefit the consumer perceives will be attained as a result of the change.  Thus, studies have found that even though satellite MVPD customers indicate a high degree of satisfaction with their service, and cable MVPD customers indicate a low degree

(less than 50%) of satisfaction with their service, there remains little movement between the two.

53.  As a result, satellite MVPD service is not a suitable direct substitute for cable MVPD services.  It has not been demonstrated that customers are willing to transfer service from a cable MVPD to a satellite, despite monopoly pricing for existing customers of the cable MVPD.  The FCC Assessment cites evidence that competition from non-cable video programming does not have an effect of restraining prices charged by cable MVPDs.  However, in the few locations where consumers have a choice between two cable services, the FCC reports that prices for cable service are 20% lower than in locations with only one cable MVPD.

54.  There are also very high barriers to entrance for any potential cable competitor in an established cable MVPD market.  The FCC Assessment notes that, along with the high capital cost of constructing a parallel cable system, there are obstacles to competition created by local franchising authorities, obtaining access to multiple dwelling unit customers (for example - tenants in apartment buildings) and obstacles created by exclusive programming rights to popular channels.  As a result of these obstacles, there has been very little effort to construct cable systems to compete with existing cable systems and such systems are believed to serve less than 2% of the MVPD market.

55.  Where a competing cable system - referred to in the industry as an overbuild - has been created, the overbuild systems are not geographically coextensive with incumbent cable system.  Such overbuilt systems are usually created by relatively small companies.  BHN can respond to such overbuilt systems by lowering prices, not in the entire market, but only in those areas in which the overbuild system actually competes.  More detailed information concerning the geographic scope of such overbuild cable systems is in the possession of BHN and available in the course of discovery.

56.  The only apparently viable threat to BHN's market power has been the very recent arrival of competing MVPD services through fiber optic phone facilities offered chiefly through Verizon and AT&T.  These services have not previously been commercially available to consumers on a widespread basis and are viewed as an arising threat, rather than a current competitive influence upon cable MVPDs.  Again, as with satellite MVPDs, customers incur substantial switching costs in changing service.

57.  According to the FCC Assessment, the demand for, and price of, Premium Cable Services has consistently risen, resulting in higher revenues for BHN and other cable MVPDs offering premium services.  In fact, BHN has raised its prices the last four (4) years, despite the lean economic times.

21

Anticompetitive Effects in the Tied Market.

58.  As noted above, for most of the relevant time period, the United States market for cable boxes has been dominated by just two companies for years, Scientific Atlanta and Motorola.

59.  BHN is simply purchasing cable boxes at a fixed cost from the manufacturers only to turn around and rent the very same boxes to the Class, with full knowledge that the Class, as a result of BHN's improper conduct, has no choice but to pay the rental fees charged.

60.  BHN not only refuses to permit customers to use other brands of cable boxes, BHN refused to sell its customers the cable boxes it rents to them and does not permit such products to be purchased directly from the manufacturer for use with a BHN system.

61.  Upon information and belief, BHN's suppliers of cable boxes are able to dominate the market as a result of the anticompetitive conduct of BHN and other cable MVPDs.  Because BHN and other cable MVPDs refuse to permit customers to acquire cable boxes other than by rental through the cable company, consumers suffer, and the suppliers to BHN and other cable MVPDs benefit from the removal of competitors and competition in the market for cable boxes.  At the same time, BHN benefits from the absence of a competitive consumer market for

22

cable boxes because the absence of competition allows BHN to compel consumers to rent the cable box from BHN, thereby producing a monthly revenue stream from the Class to BHN arising directly from its anticompetitive conduct.

62.  Upon information and belief, based upon allegations made in other litigation, Scientific Atlanta and Motorola have previously demonstrated very close relationships with cable MVPDs, including at least one documented case of a willingness to act in collusion with cable MVPDs to manipulate sales data and contracts relating to the sales of cable boxes.

63.  The contracts between BHN and the suppliers of cable boxes are not public information but are in the possession of BHN and may be obtained in discovery.  It is not presently known whether such contracts contain an explicit agreement by the manufacturers to refuse to deal with the general public in selling cable boxes.

64.  If not for the tying of products, Plaintiff and the Class could purchase a cable box from a manufacturer of their choice and use it to access the Premium Cable Services provided (for a cost) by BHN.  As noted above, the CEA (previously defined) has expressed not only a willingness to enter into the cable box market, but has protested to the FCC that BHN and other major cable MVPDs have engaged in apparently coordinated efforts to keep them out of that market.

23

65.  As pointed out by the CEA's December 2006, letter to the FCC, although BHN and other cable MVPDs reported to the FCC that they were committed to the true2way technology, these same companies had previously represented that they were committed to CableCARD.  Quite obviously, consumer electronic manufacturers have not been willing to commit their resources to new product lines when the cable MVPDs have demonstrated a desire to preserve their market positions by changing the technological standard.  The choice to use alternative technologies in lieu of a BHN cable box, has not been available, and is not currently available to the Class.

66.  The choice to use other cable boxes is not available to the Class as a result of BHN's practices.  By compelling customers to rent cable boxes, and in restraining an open market for cable boxes, BHN coerces Plaintiff and the Class to pay a significantly larger sum of money than would be required if the two distinct products (Premium Cable Services and cable box) were not tied by BHN.

67.  It is estimated that the useful like of a cable box is between 3 and 5 years.  In many cases, the rental fees that the Class is forced to pay for the cable boxes supplied by BHN exceed the true cost of the cable box, even if the cost of the cable box were unadjusted for the effect of the anticompetitive practices on the price of cable boxes.

24

<u>The Effect on Interstate Commerce is Not Insubstantial</u>.

68.  BHN provides cable services to more to millions of customers.

69.  A substantial portion of BHN's subscribers have upgraded from basic cable to digital video services, referred to herein as the Premium Cable Services, and therefore rent cable boxes from BHN.

70.  The exact amount of revenue which BHN derives from the lease of cable boxes is not known, but should be readily discernable in discovery.  It is clear, however, that the amount of money at issue is "not insubstantial."

## COUNT I

### (<u>Violation of the Sherman Anti-Trust Act - Unlawful Tying</u>)

71.  Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

72.  Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, makes it unlawful to enter into a contract in restraint of trade or commerce.  Congress has granted a private right of action to those injured in violation of this provision.

73.  Plaintiff, on behalf of herself and the Class, seeks redress for BHN's violation of Section 1 of the Sherman Anti-Trust Act.

74. BHN improperly ties and bundles its Premium Cable Services with the required rental of a cable box. Specifically and as explained above, BHN contracted with the Class to provide Premium Cable Services, but only on the condition that the Class also lease a cable box from BHN.

75. As a result, the Class cannot unbundle the tied products (the Premium Cable Services and the cable box).

76. There is market for cable boxes that is separate and apart from the market for BHN cable services. The two items (Premium Cable Services and the cable box) are distinct and separate products.

77. Because of BHN's market power in those communities in which it is the sole cable MVPD, the Class is forced to pay rental fees for the cable box in addition to fees for Premium Cable Services and is deprived the option of purchasing the cable box, in a free and open market or even directly from BHN or its supplies.

78. Defendant has, at all times relevant to this action, maintained sufficient economic power in the Premium Cable Services market to coerce Plaintiffs and the Class to lease and/or otherwise accept the tied product (the cable box) that they would not otherwise lease or accept from BHN. This economic power will continue absent the relief sought herein.

26

79.  BHN's improper tying and bundling harms competition.  Upon information and belief, just two manufacturers of cable boxes dominate the industry and they provide most of their products to BHN and a small group of other major cable MVPDs.  Since the Class can only lease cable boxes directly from BHN, there is little incentive for other manufacturers to enter the market, and those that do are foreclosed from renting and/or selling cable boxes directly to members of the Class at a lower, market-driven, cost.

80.  Defendant's conduct at issue involves a substantial amount of interstate commerce in the market for cable boxes.

81.  BHN's tying and bundling of its Premium Cable Services and cable boxes constitutes an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1.

82.  There is no lawful business justification for BHN's actions.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on her own behalf and on behalf of the Class, demands judgment in their favor and against Defendant as follows:

a.  For an Order certifying the Class pursuant to Fed.R.Civ.P. 23 appointing Plaintiff as the representative of the Class, and appointing counsel for Plaintiff counsel for the Class;

b.  For an Order that Brighthouse violated the Sherman Anti-Trust Act, 15 U.S.C. § 1;

c.  For an Order enjoining Brighthouse from continuing the practice of tying premium cable services to the rental of a cable box from Brighthouse;

d.  For an award of all compensatory and other damages suffered by Plaintiff and the Class;

e.  For an award of all statutory damages under both the Sherman Anti-Trust Act;

f.  For an award of all costs incurred by Plaintiff in pursuing this action;

g.  For an award of reasonable attorneys' fees; and

h.  For any other relief the Court deems reasonable.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury of all issues triable.

RESPECTFULLY SUBMITTED,

s/ Brian M. Clark
Dennis G. Pantazis
Brian M. Clark
Attorneys for Plaintiff

OF COUNSEL:
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500


## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> F. Keith Covington, Esquire
> Bradley Arant Boult Cummings LLP
> One Federal Place
> 1819 Fifth Avenue North
> Birmingham, Alabama 35203-2119
>
> Bruce D. Sokler, Esquire
> Robert Kidwell, Esquire
> Mintz, Levin, Cohn, Ferris, Glovsky & Popeo P.C.
> 701 Pennsylvania Avenue NW, Suite 900
> Washington, DC 20004

s/ Brian M. Clark
Of Counsel