FILED

2009 Aug-07  AM 11:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KAREN ANN ISHEE PARSONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV Action No.: CV-09-B-0267-S** |
| | ) | |
| **BRIGHT HOUSE NETWORKS, LLC** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

Plaintiff Karen Ann Ishee Parsons states the following as her Opposition to the Motion to Dismiss First Amended Complaint filed by defendant Bright House Networks, LLC ("BHN").

## LEGAL STANDARD AND FACTUAL BACKGROUND

The claim in this case is that defendant BHN unlawfully ties the purchase of television set-top cable boxes ("cable boxes") to the purchase of Premium Cable Services.  The First Amended Complaint ("FAC") like the original Complaint, contains a single count alleging an illegal tying claim under § 1 of the Sherman Antitrust Act. 15 U.S.C. § 1.  The "tying product" is identified and defined in the FAC as "Premium Cable Services" (FAC, ¶25), and the "tied product" is identified

and defined in the FAC as set-top cable boxes, or "cable boxes"  (FAC, ¶ 27).

The basic facts are that Premium-Cable Services are additional programming, including high definition channels, movie channels, and pay-per-view events that are offered by BHN, in addition to basic cable services. (FAC, ¶ 26).  In order to receive Premium-Cable Services, a customer must purchase BHN basic cable services, and then pay additional charges to receive Premium-Cable Services. (FAC, ¶ ¶ 23, 26). Basic cable services can be viewed on modern television sets without the need for a cable box.  The television cable is simply plugged into the television set.  Premium-Cable Services, however, require a cable box to "unscramble" the premium channels. (FAC, ¶ 26).

BHN does not manufacture cable boxes.  (FAC, ¶ ¶ 29, 58-60).  Instead, BHN purchases cable boxes primarily, if not in toto, from the two largest manufacturers of cable boxes, Scientific Atlanta and Motorola.  (FAC, ¶ 58).  The cable boxes are not available on the retail market as a substitute for a unit provided by BHN.  (FAC, ¶ 60).  Instead, the only way to procure a cable box to view Premium-Cable Services is by renting the cable box, and also many times a dedicated remote control unit, from BHN. (FAC, ¶ 27).  The customers are charged a separate monthly fee by BHN for rental of the cable box.  (FAC, ¶ 27).

BHN operates in geographic markets throughout the United States.  The

communities BHN serves are Bakersfield, California; Central Florida; Tampa Bay, Florida; Wellington, Florida: Cantonment, Florida; DeFuniak Springs, Florida; Birmingham, Alabama; Elmore County, Alabama; Eufala, Alabama; Indianapolis, Indiana; and Metro Detroit, Michigan. (FAC, ¶ 7).  The communities, or clusters of communities, are described in geographic terms by the name of the city or area served.  (FAC, ¶ 7).  However, the actual geographic boundaries of the markets served are bounded by the terms of franchise agreements BHN has with local governmental authorities.  (FAC, ¶ 7).  The franchise agreements allow BHN to operate with a defined geographic area, and grant easements for cable infrastructure, in exchange for franchise fees to be remitted to the local governing authority, based on revenues received from subscription fees paid.  (FAC, ¶ 7). It is very rare for there to be more than one cable service provider, or Multichannel Video Program Distributor ("MVPD") in a defined geographical area. (FAC, ¶ 48), and the infrastructure demands alone, not to mention market saturation by the incumbent MVPD, create substantial barriers to any competition within a franchised area. (FAC, ¶ ¶ 47-55).

Recognizing the barriers to competition by other cable providers within a geographic franchise market, and the virtual monopoly MVPDs had on the cable box market within these areas, Congress enacted 47 U.S.C. § 549, Section 629 of the

Communications Act of 1934, directing the FCC to adopt regulations to assure commercial availability of cable boxes.  (FAC, ¶ 32).  In short, Congress required, and the FCC complied by enacting regulations, that would "uncouple" the security elements of a cable box from its other functions, i.e., changing channels, pay-per-view ordering capabilities, DVR capabilities, etc., such that cable providers would not be in danger of having Premium Cable Services "stolen," but a market would develop for cable boxes so that prices would be competitive, and consumers would have choices. (FAC, ¶ 33).

These barriers have not been lowered.  In fact, still at this time, the only boxes available are those rented from BHN.  In fact, BHN will not even sell the boxes, outright, to its customers, instead clinging to a practice that leads to rental payments over the useful life of the cable boxes far in excess of the value of the cable boxes. This Opposition shows not only that a tying claim has been adequately plead, but that, ultimately, the facts will be proven to render final judgment for Plaintiff.

The Supreme Court in <u>Ashcroft v. Iqbal</u>, ___S.Ct. ___, 2009 WL 1361576 (May 18, 2009), just over two months ago, laid out the standard for properly pleading an antitrust claim.  The decision recognizes the interplay between Rule 8(a)(2), requiring nothing more than a short and plain statement of the claim in the promise that under a Rule 12(b)(6) motion to dismiss for failure to state a claim, all well

pleaded facts must be taken as true, <u>St. Joseph's Hosp. Corp. v. Hosp. Corp. of Am.</u>,

(11th Cir. 1986), and the gatekeeper function of motions to dismiss, particularly in

complex antitrust cases.  The Court stated:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As the Court held in <u>Twombly</u>, 550 U.S. 544, 127 (S.Ct. 1955), 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. <u>Id</u>, at 555, 127 (S.Ct. 1955) (citing <u>Pappasan  v. Allain</u>, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550, 127 S.Ct. (1955).  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." <u>Id</u>., at 557, 127 S.Ct. (1955).
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." <u>Id</u>., at 570, 127 S.Ct. (1955).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. <u>Id</u>., at 556, 127 S.Ct. (1955).  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. <u>Ibid</u>. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" <u>Id</u>., at 557, 127 S.Ct. (1955) (brackets omitted).

<u>Iqbal</u>, 2009 WL 1361536 at *12

Plaintiff has met this plausibility standard under the in the First Amended

Complaint.  Defendant's burden is particularly high where "dismissals are disfavored

in fact intensive antitrust cases." Spanish Broadcasting Sys. of Fla., Inc. v. Clear

Channel Comm., Inc., 376 F.3d 1065, 1070 (11th Cir. 2004). This is particularly true

regarding the arguments made as to the sufficiency of the definitions of the relevant

markets. "The definition of the relevant market is a question nearly dependent upon

the special characteristics of the industry involved." Nat'l. Bancard Corp. v. VISA,

U.S.A, 779 F.2d 592, 604 (11th Cir. 1986), quoting Salmeyer v. Coca Cola Co., 515

F.2d 835, 839 (5th Cir. 1975). The FAC lays out the characteristics of the industry

that create the relevant product market, product, geographic market, and market

domination of Defendant in this case. The FAC certainly and clearly sets forth a

tying claim under Section I of the Sherman Anti-Trust Act.

Lastly, Defendant attempts to diminish the pleadings in the case by stating that

they are "cookie cutter" pleadings currently in use in other cases against other

MVPDs in similar antitrust cases. There is no doubt that this is a problem across the

cable industry and similar suits have been filed across the country. Three of the

"groups" of cases have been consolidated by the Judicial Panel on Multidistrict

Litigation. The case against Time Warner Cable is the subject of MDL proceedings

in New York In re: Set-Top Cable Television Box Antitrust Litigation, MDL No.

1995 in the United States District Court for the Southern District of New York.

Similarly, the cases against Comcast have been consolidated in the Eastern District

of Pennsylvania (MDL 2034), and the cases against Cox Cable have been consolidated in the Western District of Oklahoma (MDL 2048).  This is a practice that is due to end. While the allegations are similar, so are the arguments made on motions to dismiss by the defendants in these various cases, particularly in the <u>Time Warner</u> case, which has already been briefed.  Obviously, the courts in these several actions will be making decisions on the path these cases will take in the near future.

# I.   <u>ARGUMENT</u>

## A.   <u>Elements Of A Tying Claim</u>

A tying claim has the following elements: (1) a tying and tied product; (2) evidence that the seller coerced the purchaser to buy the tied product; (3) that the seller has sufficient market power in the tying product market to force the buyer to accept the tied product; (4) anti-competitive effects in the tied market; and (5) involvement of a "not insubstantial amount of interstate commerce in the market of the tied product." <u>Avery, Inc. v. Gulf Abstract & Title, Inc.</u>, 758 F.2d 1486, 1502-07 (11th Cir. 1985).  Contrary to the assertions of the Defendant, each one of these elements has been met.

### 1.   <u>Cable Set-Top Boxes Are Separate Products From Premium-Cable Television Services.</u>

To understand precisely why set-top boxes are separate from cable services,

one must understand the relationship of cable boxes to Premium-Cable Services, and to basic cable television services. Modern televisions are "cable ready", that is, to view a limited number of local and national channels for a monthly fee, a subscriber need not have a cable box (FAC, ¶ 21). Persons who purchase this basic level of service without a set-top box are not included in the class. (FAC, ¶ 21). Customers desiring premium and high definition channels, and other premium services, pay an increased monthly fee. In order to view these specialized tiers and premium services, it is necessary to purchase a set-top cable box. (FAC, ¶ 23). This cable box unscrambles the programming for Premium-Cable services.

The Premium-Cable Services are the "tying product." (FAC, ¶ 25). The "tied product" is the cable box. (FAC, ¶ 27). Defendant does not manufacture or design cable boxes, BHN merely purchases them in bulk to pass along in rental. (FAC, ¶ ¶ 29, 58-60). Most importantly, there is no need for a cable box unless premium channels are purchased, and, while the manufacture of cable boxes is wholly separate, none of the manufacturers will sell these cable boxes to the general public (FAC, ¶ 29), who could purchase them to perform the same function that the now rented boxes perform.

Defendant argues that there is no showing that the public perceives cable set-top boxes as a separate product, or that there has been any activity on behalf of BHN

to foreclose competition on the merits in a product distinct from the market for the tying item Premium Cable Services.  Defendants are wrong on both accounts.

First, the question of whether there are two separate products is a question of whether there are two distinct markets for the product that are distinguishable in the worlds of the buyers. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 104 S.Ct. 1551, 1562 (1984), cited in Southtrust Corp. v. Plus Sys., Inc., 913 F.Supp. 1517, 1525 (N.D. Ala. 1995).  This question cannot be answered at the motion to dismiss stage. "The question of whether a series of transactions or whether a given product constitutes a separate market is a question of fact." Thompson v. Metropolitan Multi List, Inc., 934 F.2d 1566, 1574 (11th Cir. 1991), citing Graphic Products Distributors, Inc. v. Itek Corp., 717 F.2d 11560 (11th Cir. 1983).

Facts that would support a finding that there is a market for cable boxes, separate from the demand for Premium-Cable Services have been plead in the FAC, see, infra, however, the inherent illogic of Defendant's argument should be pointed out first.  Defendants argue that there is no reason to believe there is a separate market for cable boxes because the two (cable boxes and Premium-Cable Services) products work hand-in-hand, and have traditionally been purchased together.  The argument that one product is useless without the other, as an indicia that no separate market exists, has been roundly rejected by the U. S. Supreme Court.

> Kodak insists that because there is no demand for parts separate from service, there cannot be separate markets for service and parts.  Brief of Petitioner 15, n.3.  By that logic, we would be forced to concluded that there can never be separate markets, for example, for cameras and film, computers and software, or automobiles and tires. That is an assumption we are unwilling to make. "We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices." <u>Jefferson Parish</u>, 466 U.S., at 19, n. 30, 104 S.Ct. at1062, n.30.

<u>Eastman Kodak Co. v. Image Technical Services, Inc.</u>, 112 S.Ct. 2072, 2080 (1992).

The Supreme Court in <u>Jefferson Parish</u>, <u>Supra</u>, stated flatly that, "We have often found arrangements involving functionally limited products at least one of which is useless without the other to be prohibited tying devices," before referencing a string cite of functionally linked products where a tying arrangement was found.  <u>Jefferson Parish</u>, 104 S.Ct. At 1563, n.30.

Not only is it a fact question as to whether there are separate product/markets, but Congress has recognized that the equipment necessary to view cable programming is a separate product, and has directed the FCC to adopt regulations promoting the commercial availability of such.  Congress enacted 47 U.S.C. § 549, directing the FCC to adopt regulations:

> To assure the commercial availability, to consumers of multichannel video programming and other services offered over multichannel video programming systems [i.e.

> cable companies] of converter boxes, interactive
> communications equipment and other equipment used by
> consumers to access multichannel video programming and
> other services offered over multichannel video
> programming systems, from manufacturers, retailers and
> other vendors not affiliated with any multichannel video
> programming distributor.

(FAC, ¶ 32).  Pursuant to this mandate, in 1998, the FCC directed the cable industry

to make the security elements of a cable box separate from the channel navigation

function specifically so that a free and open market for such cable boxes could be

developed (FAC, ¶ 33).  The question of whether it is "plausible" that there is a

separate market for cable boxes, which is a fact question, has not only been answered

by the facts, but Congress has specifically recognized that the products are separate,

and encouraged the development of a market in cable boxes separate from Premium-

Cable services.

The fact that Congress has recognized the need for the development of a market

for cable boxes, plead in the FAC at ¶ 32, makes it clear that the functional test for

showing separate markets has been met.

> The requirement that two distinguishable product markets
> be involved follows from the underlying rationale of the
> rule against tying.  The definitional question depends on
> whether the arrangement may have the type of competitive
> consequences addressed by the rule.  The answer to the
> question whether petitioners have utilized a tying
> arrangement must be based on whether there is a possibility

> that the economic effect of the arrangement is that condemned by the rule against tying-that petitioners have foreclosed competition on the merits in a product market distinct from the market for the tying item.

Id. The reason that Congress acted to foster the separate market for cable boxes was to avoid the anticompetitive practices addressed by the Sherman Act's prohibition against tying arrangements. In enacting the Regulations, Congress certainly saw "[T]he possibility that the economic effect of the tying arrangement [will be to] foreclose competition on the merits in a product market." If Congress foresaw this effect, then Plaintiff has made more than a "plausible" argument that the two products are separate for the purposes of tying claims analysis.

Another clear indicia of separate markets for cable boxes and Premium-Cable Services is the fact that cable boxes have different features (a DVR option or not), that are selected by consumers. If the cable box were truly seen as an integrated component of Premium-Cable Services, then consumers would not make selections of different options for their cable boxes.

### B.   The FAC Properly Alleges A Market For Premium-Cable Services, And that BHN Has Sufficient Economic Power In That Market.

The FAC succinctly defines Premium-Cable Services as "those cable video services, which are not available to customers by simply plugging into a cable-ready television. This would include all scrambled or otherwise secured video

channels, as well as pay per view or on demand cable video programming, for which BHN charges fees other than the fee for basic cable." (FAC, ¶ 23). In other words, those services that: (1) require a cable box; and (2) are provided at costs beyond basic cable.

The relevant product market is defined in terms of product and geography, as "the area of effective competition." Brown Shoe Co. v. United States, 82 S.Ct. 1503, 1523 (1962). The area of effective competition, in geographic terms, is stated in the original Complaint as:

BHN is a provider of cable services in delineated markets in the United States, including Birmingham, Elmore County, and Eufaula, Alabama; Central Florida and Tampa, Florida; Bakersfield, California; Indianapolis, Indiana; and Metro Detroit, Michigan. (FAC, ¶7). The original Complaint does not consider this to be a nationwide class, but a class consisting of those "delineated markets" where BHN does business. Perhaps the flaw in the original Complaint was in assuming Defendant would understand its own business, realize that the allegation is not that the market is nationwide, but the market is in those areas where a cable company has a local license, which are located throughout the country. In order to be clear, the FAC spells it out:

BHS represents that it provides cable services in the

-13-

following communities:
Cantonment, Florida
Defuniak Springs, Florida
Central Florida (Orlando)
Tampa Bay, Florida
Birmingham, Alabama
Elmore County, Alabama
Eufaula, Alabama
Bakersfield, California
Indianapolis, Indiana
Metro Detroit, Michigan.

(FAC, ¶ 7).

More specifically; the FAC specifically spells out the geographic boundaries of those communities as "the geographic boundaries of the franchises to operate as the cable provider in the above-referenced communities." (FAC, ¶ 7). Each BHN geographic market is actually a franchise granted by a local governmental entity (usually a municipality), in which BHN may operate, but has to pay franchise fees, computed as a function of revenue received from monthly fees collected. The specific markets are actually defined by those franchise agreements because in each instance, BHN is the only cable company granted a franchise (FAC, ¶ 7). These definitions clearly lay out "what" is being used as a tying product (premium cable services), and "where" the tying product forces consumers to buy the "tied" cable box product (the geographically defined boundaries of the local cable franchises in which BHN operates, where no other cable operators operate.

### C.    The Geographic Market Is Properly Plead.

The FAC states that the relevant geographic market is the collective of the markets in which BHN does business (FAC ¶¶ 7, 8). Paragraph 7 of the FAC lays out the geographical locations and states that, "BHN's unlawful practices, as detailed herein, are uniform within the markets in which BHN sells its services." (FAC, ¶ 8). This market definition is inherent to the nature of BHN's provision of services: cable television requires a substantial investment in physical infrastructure; the only potential customers for BHN cable live in structures serviced by a BHN line.  (FAC ¶ 48-55).  Infrastructure requirements present a barrier to entry for any potential competitor to challenge BHN's local monopolies. (FAC ¶ 52).  Similarly, this same barrier helps prevent BHN from expanding into markets controlled by its major competitors.  (FAC ¶ 48).  Cable providers normally do not compete with one another in a particular community.  (FAC ¶ 48).  Less than 2% of all cable customers have a choice between cable providers at their home (FAC ¶ 54).

BHN disputes that the FAC presents a plausible economic model for a geographic market.  The simple definition of a geographic market is that area in which the defendant does business and where the consumer in that area can turn to acquire a substitute from another provider.  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961); Heerwagen v. Clear Channel Comm., 435 F.3d 219, 228-

229 (2d Cir. 2006).  Normally, such disputes are questions of fact, or at least an issue to be decided after development of a factual record and the submission of expert opinions.  Todd, 275 F.3d at 200.  The issue presently before the Court is simply whether the proposed economic model is plausible; an affirmative conclusion can be reached under the facts pleaded in this case.  This is a question of fact.  Advantage Telephone Directory Consultants, Inc. V. GTE Directories, Corp., 849 F.2d 1336, 1341 (11th Cir. 1987).

The relevant geographic market is the geographic area where buyers could reasonably turn for alternative sources of supply.  L.P. Draper & Son v. Wheelabrator - Frye, 735 F.2d 414, 423 (11th Cir. 1984).  In this case, in the geographic markets defined by the local franchises, the parties have no other supplier to turn to.  It cannot be rationally suggested that a consumer would relocate just so he or she could purchase Premium Cable Services, or any cable services for that matter, from another supplier.  Defendant cites no case for the proposition that local cable television franchise boundaries is not a plausible geographic market boundary.  No such case is cited because courts considering the question have come to the opposite conclusion.  In N.Y. Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc., 651 F.Supp. 802, 807 (S.D. N.Y. 1986), the Court denied a motion to dismiss an antitrust claim.  The motion was based, in part, on a challenge to the definition of the relevant

market as the local franchise.  The Court stated the following:

> In the "retail" market, which covers lower Manhattan and
> the product market of all cable services, MCTV has a de
> facto exclusive franchise to sell to subscribers and,
> therefore, a lawful monopoly.
>
> * * * * *
>
> Within the area of the franchise, it is impossible for
> competing programmers, given the alleged violation, to
> enter the market and prevent HBO from charging
> noncompetitive prices to MCTV that may be indirectly
> passed on to consumers.  The very nature of the alleged
> violation thus defines the geographic market.

N.Y. Citizens Comm. on Cable TV, 651 F. Supp. at 802, 807(S.D. N.Y. 1986).

See also Yankees Entertainment & Sports Network, LLC v. Cablevision Systems,

Corp. 224 F.Supp.2d 657, 668 (S.D. N.Y 2002) (refusal to dismiss antitrust claim

that cable providers violated antitrust laws); Cable Holdings of Georgia, Inc. v.

Home Video, Inc., 572 F.Supp. 482 (D.C. Ga. 1983) (Summary judgment denied

in antitrust claim where relevant product market defined in terms of cable

television franchise).

**D.** **The FAC Properly Alleges That BHN Possesses Market Power In**
**The Relevant Product Market, And That There Is No Reasonable**
**Interchangeability.**

As pleaded in the FAC, BHN's business practices regarding the tying of

cable boxes is uniform in the markets in which it does business. (FAC ¶ 8).  The

cable industry is regulated, or an attempt is made to regulate it, on a national basis. (FAC ¶ ¶ 32, 37). The business model which creates, and perpetuates, semi-natural local monopolies is inherent to the infrastructure used to provide cable service and is common throughout each of the markets in which BHN does business. (FAC ¶ 48-59). The determination of the relevant geographic market must "correspond to the commercial realities" and "may be as small as a single metropolitan area." Brown Shoe Co. v. United States, 370 U.S. 294, 336-337 (1962); Heerwagen,[1] 435 F.3d 228. In this case, the commercial reality pertinent to the tying claim is that BHN enjoys the market power to compel its customers to lease cable boxes not on a national level, or on a purely local level, but in each of the markets in which it does business.

The FAC notes that, in some markets, there are, "overbuilders" those who attempt to construct a new cable system where BHN is an incumbent cable provider (FAC ¶ 55). BHN also points to the FAC's statement. It is also true that some telephone companies have attempted to compete with BHN by installing new hub to home fiber optic systems which can provide the same package of video, internet and phone services as does BHN. (FAC ¶ 56). These potential

---

[1] Although Heerwagen rejected the argument, for class certification purposes, that all markets controlled by Clear Chanel could be considered as a unified geographic market, it did not so categorically, but on the facts distinguishing that case from United States v. Grinnell Corp., 384 U.S. 563 (1966) and in particular the lack of a showing of a common basis for market power and a lack of any unifying structure in the market for concert tickets. 435 F.3d at 219. Here, the facts showing such a common basis distinguish this case readily Heerwagen.

competitors, however, do not have any substantial impact on BHN's market power.  The "overbuilders" are relatively small companies and serve less than 2% of the overall market.  (FAC ¶ 55).  Overbuilders face very substantial barriers to entry in terms of infrastructure costs, franchising and acquiring competitive programming (FAC ¶ 55).  Similarly, the telecom based competitors are not alleged to have any current or past significant competitive impact on BHN's market position, it is an incipient technology fighting for even the right to compete with BHN's monopoly power.[2]  (FAC ¶ 56).  As with the cable overbuilders, these potential competitors face high barriers to entry and have not been shown to have any significant current effect on BHN's market share in any market. (FAC ¶ 56).  That there may be some such effect in the future does not deprive present and past customers of a remedy, nor can the Court attempt such a prediction at the pleading stage.  Geneva Pharm, 386 F.3d at 509-510 (reversing summary judgment, finding that future actions of consumers and potential competitors represented a question of fact).

---

[2]  The telephony based competitors continue to fight BHN for the right to compete.  For example, on May 26, 2009, the D.C. Circuit rejected the cable companies' objection to an FCC rule invalidating contracts the cable companies had reached with multiple dwelling building owners which would have excluded the telephone competitors from installing infrastructure for customers in those buildings.  Nat'l. Cable & Telecomm. Ass'n v. FCC, F.3d, 2009 WL 1444094 (D.C. Cir. 2009).

   In discussing whether there are potential competitors, it is important to remember that this is not a Section 2 attempted monopolization case, it is a tying case.  Along with prospective relief, Plaintiffs are seeking a remedy for BHN's **past** use of market power to inflict tying injuries upon consumers.

Neither the few overbuilders, nor the incipient technologies presented by the phone companies, currently represent a significant erosion of BHN's market power in its controlled communities. Instead, BHN's revenues from its cable operations continue to grow annually. (FAC ¶ 57). That BHN may have greater market share in some markets than in others does not logically mean that BHN lacks power in all markets to enforce a tie. As discussed in Part I.B., below, 100% market power in the tying market is not required. In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig., 562 F. Supp. 2d 392, 400 (E.D.N.Y. 2008); In re Visa Check/Mastermoney Antitrust Litig., No. 96-CV-5238 (JG), 2003 WL 1712568, at *4 (E.D.N.Y. Apr. 1, 2003)(market share of 26% in the tying market sufficient to withstand motion for summary judgment on tying claim). As explained below, even taking into account the small erosions on market power achieved by overbuilders and the emerging telcom video providers, BHN still enjoys sufficient market power in the areas in which it does business to achieve an unlawful tying scheme.

The FAC states a plausible construction of the geographic market as it relates to the tying claim, i.e., that geographic market consists of those communities in which BHN operates its cable systems. To the extent that BHN's arguments as to the relevant product and geographic markets raise legitimate issues, the answers to those questions cannot be reached based on the pleadings. Spanish Broadcasting Sys. of

Fla., Inc. v. Clear Channel Comm., Inc., 376 F.3d 1065, 1080 (11th Cir. 2004), citing

Quality Foods de Centro Am., SA. v. Latin America Agribusiness Def. Corp., S.A.,

711 F.2d 989, 944-45 (11th Cir. 1983)("dismissals are disfavored in fact intensive

antitrust cases.").  See Nat'l Bancard Corp. v. VISA, U.S.A., 779 F.2d 592, 604 (11th

Cir. 1986), quoting Salmeyer v. Coca Cola, 515 F.2d 835, 839 (5th Cir. 1975)("The

definition of the relevant market is a question nearly dependent upon the special

characteristics of the industry involved.").  The FAC does distinguish Premium-Cable

Services provided by BHN from those provided by Satellite providers, and then

explains why they are not interchangeable.  First, cable companies control 69% of the

market for Premium-Cable Services, as opposed to 27.7% for Satellite providers.

(FAC, ¶ 50).

        Moreover, the FAC outlines the rural/urban divide in the subscription for cable

vs. satellite (FAC, ¶ 50).  Finally, the FAC outlines the ability of cable providers such

as BHN to "bundle" its MVPD services with internet and telephone services as a

particular competitive advantage over satellite providers. (FAC, ¶ 51).  Whether the

differences between satellite and cable providers are sufficient to make one

interchangeable for the other, of course, is based on the specific facts relevant to these

particular products.  Because the inquiry is so fact driven, as stated above, the

question cannot be answered on the pleading. See, Spanish Broadcasting Sys., supra.

The pleadings set forth the above-referenced factors distinguishing the two.  It is ultimately up to a jury to determine whether these factors do, indeed, distinguish satellite and cable services.[3]

The issue of market power is "heavily fact-dependent" and, therefore, not properly disposed of on a motion to dismiss.  In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig., 562 F. Supp. 2d 392, 401 (E.D.N.Y. 2008).  "[S]uch a ruling is only possible once all of the facts have been developed, either on a motion for summary judgment or after trial (as in Broadway Delivery Corp. [v. United Parcel Service, Inc., 651 F.2d 122, 129 (2nd Cir.), cert. denied, 454 U.S. 968 (1981)]."  Virgin Atl. Airways Ltd. v. British Airways PLC, 872 F. Supp. 52, 63 (S.D.N.Y. 1994); see also Frito-Lay, Inc. v. Bachman Co., 659 F. Supp. 1129, 1139 (S.D.N.Y. 1986)("Whether monopoly power actually exists is a question of fact").

Market power is "the power to control prices or exclude competition."  United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).  Market power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market."  Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 98 (2nd

---

[3] The issue of demand substitution is plead with specificity, as to satellite providers and "over builders" is accessed in the FAC. (FAC, ¶¶ 49-57), including allegations that price has continued to rise as the result of the lack of competition in the product market. (FAC, ¶ 57).

Cir. 1998)(citing K.M.B. Warehouse Dist., Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2nd Cir. 1995).  "If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power.  In fact, this arguably is more direct evidence of market power than calculations of elusive market share figures."  Todd v. Exxon Corp., 275 F.3d 191, 206 (2nd Cir. 2001); see also, Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., 996 F.2d 537, 546 (2nd Cir. 1993)(plaintiff may show market power "without 'detailed market analysis' by offering 'proof of actual detrimental effects, such as reduction of output.'")(quoting Federal Trade Comm'n v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61 (1986)).

Concerning the second method of alleging market power, "the higher a market share, the stronger is the inference of monopoly power."  Broadway Delivery, 651 F.2d at 129.  "A court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics. . . . These characteristics include the 'strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of the consumer demand.'"  Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 98 (2d Cir. 1998)(quoting Int'l. Dist. Ctrs., Inc. v. Walsh Trucking Co., Inc., 812 F.2d 786, 792 (2nd Cir. 1987).  The issue of whether there are sufficient barriers to entry to support a finding of monopoly power

-23-

is also a "fact-intensive question" not resolvable on a motion to dismiss.  See, In re

EVIC Class Action Litig., No. M-21-84 (RMB), 2002 WL 1766554, at * 11, n.34

(S.D.N.Y. Jul. 31, 2002)(citing Walsh Trucking, 812 F.2d at 792-93).  The other

issues informing this analysis are likewise questions of fact that should not be

resolved on a motion to dismiss.  See, e.g., Envirosource, Inc. v. Horsehead Resource

Dev. CO., Inc., 1997 WL 525403, at *3 (S.D.N.Y. Aug. 21, 1997)("extensive

analyses of reasonable interchangeability and cross elasticity of demand, however,

are not required at the pleading stage.").

It is important to note that although the tools used by courts to divine market

power for purposes of Sections 1 and 2 of the Sherman Act are interchangeable, the

quantum of market power necessary to prevail on a Section 1 tying claim is far less

than that necessary under Section 2:

> The standard of 'sufficient economic power' [in an antitrust tying case]
> does not . . . require that the defendant have a monopoly or even a
> dominant position throughout the market for the tying product.  [The
> Supreme Court's] tying cases have made unmistakably clear that the
> economic power over the tying product can be sufficient even though
> the power falls short of dominance and even though the power exists
> only with respect to some of the buyers in the market.

Hill v. A-T-O, Inc., 535 F.2d 1349, 1353 (2d Cir. 1976), quoting Fortner Enterprises,

Inc. v. U.S. Steel Corp., 394 U.S. 495, 502-03 (1969).

-24-

BHN's motion addresses Plaintiffs' allegations concerning market share but is deafeningly silent on the clear allegations concerning direct evidence of its market power in the market for Premium-Cable services.  These allegations include: (1) BHN held sufficient market power to enable it to raise its prices by for the last four years, despite turbulent economic times, (FAC ¶ 57).  These allegations concerning direct evidence of market power are independently sufficient to sustain Plaintiffs' FAC. Todd, 275 F.3d at 214(holding allegation concerning direct evidence of anticompetitive effects in the market sufficient to withstand motion to dismiss); In re EVIC, 2002 WL 1766554, at *12 (same).

Alternatively, the FAC cites to a January 19, 2009 FCC Assessment in alleging that cable MVPDs, including BHN, enjoy a 70% market share in the market for basic cable services and that such dominant market share translates into an equally dominant market share in the market for Premium-Cable services.  (FAC ¶ 50).  As explained above and in the FAC, the attribution of market share from basic cable services to Premium-Cable services is justified because premium cable services can only be purchased in connection with the purchase of basic cable services.[4]  (FAC ¶

---

[4]  BHN argues that Plaintiffs have made a "naked assertion" of economic power insufficient to survive a motion to dismiss when they allege BHN's control over the basic cable services market "naturally gives BHN control over Premium-Cable Services." BHN misses the essential fact, however, that customers must purchase both basic cable services and Premium-Cable Services from the same provider, thereby making Plaintiffs' assertion about the interrelation between these markets anything but naked.  Whatever the case, as noted above, BHN fails to address other allegations which concern direct evidence of market power that form an independent basis to sustain Plaintiffs' FAC.

  BHN cites to Sheridan v. Marathon Petroleum Co., 530 F.3d 590 (7th Cir. 2008).  This case is easily

26).  These national figures illuminate the competitive landscape found in the markets where BHN services its customers.  Indeed, this 70% market share likely understates the market share actually held by BHN in the markets where it in fact competes, (FAC ¶ 50), because "cable MVPDs do not normally compete against each other, but operate in geographically divided local markets" (FAC ¶ 48), satellite MVPDs largely service areas where cable MVPDs do not provide service, and satellite service is effectively foreclosed in many urban areas.  (FAC ¶ 50).  Whatever the case, courts have consistently held that a market share of 30 percent or higher is sufficient to constitute market power for purposes of an antitrust tying claim.  In re Wireless Tel. Svs. Antitrust Litig., 385 F. Supp. 2d 403, 418 (S.D.N.Y. 2005)("it has become clear that possession of a 30 percent market share is the minimum sufficient by itself to confer market power" in antitrust tying case).  And this 30% figure is no hard and fast rule because market share is but one part of the evaluation of monopoly power:

> More fundamentally, a finding that MasterCard's market share is less than 30 percent would not, in any event, foreclose the possibility that the Individual Plaintiffs may succeed on their Section 2 claims.  That is because market share and monopoly power are not the same thing; the former is merely evidence of the latter.

---

distinguishable.  Unlike Plaintiff's detailed allegations concerning market share, market power and barriers to entry, Sheridan concerned a simple allegation that the defendant was "the fourth-largest United States-based integrated oil and gas company and the fifth-largest petroleum refiner in the United States."  Sheridan, 530 F.3d at 594.

<u>In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.</u>, 562 F. Supp. 2d 392, 400 (E.D.N.Y. 2008).   <u>See also</u>, <u>In re Visa Check/Mastermoney Antitrust Litig.</u>, No. 96-CV-5238 (JG), 2003 WL 1712568, at *4 (E.D.N.Y. Apr. 1, 2003)(market share of 26% in the tying market sufficient to withstand motion for summary judgment on tying claim).   Accordingly, Plaintiffs allegation of 70% or more market share held by BHN is more than sufficient to survive a motion to dismiss.

Plaintiffs also allege high barriers to entry in the market for cable MVPD, including "the high capital cost of constructing a parallel cable system, . . . obstacles to competition created by local franchising authorities, obtaining access to multiple dwelling unit customers (for example – tenants in apartment buildings) and obstacles created by exclusive programming rights to popular channels."  (FAC ¶ 50).  Other competitive advantages make these high barriers to entry even more formidable.  For instance, Plaintiffs allege that BHN enjoys a competitive advantage over satellite providers to the extent that satellite providers cannot bundle broadband and phone service, as BHN can.  (FAC ¶ 51).  Plaintiffs further allege that BHN, as an incumbent service provider, also enjoys a competitive advantage over overbuilder cable companies, phone companies and satellite providers to the extent there exists appreciable switching costs in terms of time and equipment.  (FAC ¶ 52).  Plaintiffs

-27-

buttress this point concerning BHN's competitive advantage as an incumbent provider by explaining that, despite studies showing appreciably lower satisfaction by customers with cable MVPDs compared to customer satisfaction with satellite providers, there is little migration by customers between the two kinds of providers. (FAC ¶ 52).  Plaintiffs further note that overbuild systems are not geographically coextensive with incumbent cable system[s] (FAC, ¶ 55).

Customers must purchase both basic cable cervices and Premium-Cable Services from the same provider.  This is yet another barrier to entry in the market for Premium-Cable Services.  Likewise, fiber optic providers must also install costly fiber optic cables and run new fiber optic lines to households to deliver comparable MVPD services, including premium services that might compete with BHN's Premium-Cable Services, to their customers.[5]  More importantly, BHN fails to address the other allegations detailed above concerning cable MVPD market dynamics that inform the evaluation of BHN's market power.

In light of these allegations concerning market conditions and the allegations concerning BHN's at least 70% market share, Plaintiffs adequately allege facts supporting an inference of market power.  These allegations provide an independent

---

[5]  Fiber optic providers have only recently been able to provide such services.  Obviously, it is a question of fact not resolvable on this motion whether such services pose a competitive challenge to BHN and other cable MVPDs. However, BHN does not dispute that this is a very recent development.  Given that the FAC prays for relief relating to past damages that stretch beyond the very recent past, BHN's argument in this regard is of no moment concerning the competitive landscape that existed until very recently.

basis to sustain Plaintiffs' FAC, as their allegations concerning direct evidence of market power form an equally adequate basis to deny BHN's motion to dismiss.

### E. Plaintiff Properly Alleges Coercion.

BHN also argues that the FAC deficiently pleads that it used its position to coerce the Plaintiffs into leasing a cable box from BHN as a condition of receiving Premium-Cable Service. Coercion does not require brass knuckles. Conditioning the purchase of the tying product upon the purchase of the tied product is coercion. Eastman Kodak Co. v. Image Tech. Svc., Inc., 504 U.S. 451 (1992); Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5 (1958); Hill v. A-T-O, Inc., 535 F.2d 1349, 1355 (2nd Cir. 1976). BHN's argument that the purchase of a set-top box is not a precondition to receiving Premium Cable Services rests upon its assertion that CableCARD technology is an adequate substitute. The FAC certainly pleads facts to dispute this assertion.

Far from disproving a coercive condition, the way that CableCARDS are available to BHN subscribers confirm a coercive situation exists and that situation has destroyed competition in the cable box market. As stated more fully, infra, at § F concerning the anticompetitive effects in the market, CableCARDS are separately manufactured, more expensive, and lack the functionality of a cable-top box, in that the CableCARD device cannot show certain programming that set-top boxes do.

-29-

(FAC, ¶ 4).  While it is ultimately a jury question as to whether such distinguishing features exclude CableCARD technology as a substitute for cable set-top boxes, facts have been plead showing that it is certainly plausible that a jury would make such a determination.

A coercive scheme may be found even if the tying arrangement leaves the consumer with some choice, or even if the coercion is not 100% effective in meeting the defendants' anticompetitive goal.  In <u>Eastman Kodak Co. v. Image Tech. Svcs., Inc.</u>, 504 U.S. 451 (1992), the Court held that summary judgment on a tying claim had been improvidently granted in a case in which Kodak was accused of coercing the purchase of its repair services by attempting to prohibit the sale of replacement parts to independent service organizations (ISO's) and selling parts only to customers who use Kodak service or chose to hire an employee to fix their own machines.  504 U.S. 458.  The Court noted that the coercion was not fully effective: "Kodak subsequently adopted policies *to limit the availability* of parts…"  504 U.S. at 455 (emphasis added); although Kodak "pressured" parts suppliers, and "took steps to restrict" the sale of used machines, ISO's were able to obtain some replacement service parts which were either obtained through Kodak or from the salvage of another Kodak machine.  504 U.S. at 458.[6]  Despite the leaks in the policy, and the choice given to

---

[6] The Ninth Circuit's opinion, which was affirmed by the Supreme Court, also noted that, "Since 1985, Kodak has had difficulty identifying ISOs and customers who use ISOs. Kodak, therefore, unknowingly sold parts to ISOs and customers who use them since it implemented the 1985 policies. Kodak is currently attempting to enforce more

owners to hire their own service employee, the Court found that there was sufficient evidence of a tying arrangement to create an issue of fact.  504 U.S. at 463.  See also, Datagate, Inc. v. Hewlett-Packard Co., 60 F.3d 1421, 1426-27 (9th Cir. 1995) (finding an issue of material fact as to coercion where the defendant presented evidence that it later retreated from its tying scheme or that the scheme was not universally applied).

Given BHN's success in keeping CableCARD from being an effective competitor, and consistent with the dismal acceptance rate of CableCARD, the Court cannot deem this now out-dated technology to be a viable choice, which precludes a finding of coercion as a matter of law.[7]  The cases upon which BHN relies present procedural and factual circumstances which are readily distinguishable and do not, as BHN posits, support dismissal of the Plaintiffs' FAC.  First, the principal decisions relied upon by BHN address the adequacy of coercion following the completion of discovery, either on summary judgment or after trial.  See Unijax, Inc. v. Champion Intern., Inc., 516 F.Supp. 941, 947 (S.D.N.Y. 1981), aff'd, 683 F.2d 678 (2d Cir. 1982) ("Coercion may be established circumstantially, inferentially or deductively [and] is a fact that must be established"); Konik v. Champlain Valley Physicians

---

effectively its policies."  Image Tech. Svc., Inc. v. Eastman Kodak Co., 903 F.2d 612, 614 (9th Cir. 1990).

[7] If BHN's argument were accepted, a firm with the market power to enforce a tie could avoid liability by simply making token exceptions for a very small percentage of its customers, but continue to reap the benefits of the tie from all other customers.

Hospital Med. Ctr., 733 F.2d 1007, 1017 (2d Cir.), cert. denied, 469 U.S. 884 (1984) and Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186 (2d Cir. 1992); see also, Freeland v. AT&T Corp., 238 F.R.D. 130, 154 (S.D.N.Y. 2006) ("[T]he ultimate question is whether the purchase of the tying product was in fact conditioned on the purchase of the unwanted tied product ...").

Second, none of BHN's cases state a rule that coercion or a condition must be 100% effective in order to state a claim for tying. In Unijax, the court found a lack of evidence that there was any condition at all. Id., 683 F.2d at 682. Instead, the Unijax court found that the defendant was trying to improve the plaintiff-distributor's flagging sales, which included exhorting the plaintiff "to purchase all grades of Champion paper, including the [allegedly tying product]." Id., 683 F.2d at 685. Similarly, in Trans Sport, the Second Circuit upheld the district court's summary judgment decision, which followed two years of discovery, after finding "no evidence that [the plaintiff] or any other dealers [in professional sports apparel] ever felt compelled to purchase [the defendant's] non-authentic products in order to receive the authentic jackets" nor that the defendant "terminated sales to [the plaintiff] because [it] refused to buy [the defendant's] non-authentic products." Id., 964 F.2d at 192. Equally unavailing is BHN's reliance on Synergetics USA, Inc. v. Alcon Laboratories, Inc., No. 08 Civ. 3669 (DLC), 2009 WL 435299 (S.D.N.Y. Feb. 23,

2009), which found that there was not coercion in the package sale of several related items where the plaintiff admitted that the defendant did in fact offer the items separately and there was no pleading that any customers had been compelled to take them as a group. Id. at *4.

The FAC demonstrates an effective and coercive campaign of tying receipt of Premium-Cable Service to the lease of a cable box from BHN.  BHN's tying arrangement has survived the event and demise of the federally mandated CableCARD technology, costing BHN only a fraction of the tie's effectiveness.  The FAC states a detailed, very plausible and legally sufficient case that BHN has coerced, and continues to condition, the sale of premium cable service upon the lease of a cable box.

### F.   Plaintiffs Have Alleged Anticompetitive Effect in the Tied Market.

BHN contends that the FAC is deficient in that it fails to allege the existence of anticompetitive effects in the market for cable boxes, the tied product. "Anticompetitive effects may be proven directly by control of prices or exclusion of competition." Park v. The Thomson Corp., 2007 WL 119461 (S.D.N.Y. 2007), citing Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.2d 256, 264 (2nd Cir. 2001). BHN does not contest that these two elements exist:  BHN does not accept any cable box on its system which it did not lease to the consumer at a price set by BHN.  Even

if CableCARD is viewed as a substitute, BHN has provided the Court with figures demonstrating that it controls over 99.5 % of the tied market for cable boxes.

Tacitly admitting that there is presently no effective competition in the cable box market, and contradicting its assertion that CableCARD represents a valid option, BHN argues that there is nothing in the record which shows that there are potential manufacturers willing to enter into the cable box retail market but for BHN's illegal tie. BHN is wrong. The FAC alleges facts showing that there are other potential entrants in the cable box market but that BHN's tying arrangement has prevented the proper operation of the market and precluded competition from those entrants. While CableCARDS are separately manufactured, BHN represents to its customers that they are only available on a rental basis from BHN. (FAC, ¶ 39). Moreover, the monthly rental fee, when associated fees are added in, is greater than a cable box. (FAC, ¶ 39). Not only is it more expensive to rent, but it lacks several of the functions of a cable box, such as pay-per-view services. (FAC, ¶ 4). As such, CableCARDS cannot be seen as a substitute for cable boxes, largely through BHN's own limitations on them.

BHN also argues that the FAC has alleged no facts sufficient to show that the combined price of the tying and the tied products is greater than if they had been sold independently. This is not so. The FAC alleges that the rental fees exceed the true value of the cable box over the life of the unit. (FAC, ¶ 67). The cost of the

combination of Premium-Cable Service is set and separable as it is billed separately. Plaintiff has alleged that the cost of the cable box is greater because it can only be leased from BHN at rates that ultimately are higher than would be paid to buy thte box. Where that is the case, the combined cost of the two products (Premium Cable Services and the cable box) is higher than if the box were able to be purchased on its own.

Cable boxes are capable of manufacture by numerous consumer electronic entities. (FAC ¶ ¶ 3, 59-61). Certainly, the advent and widespread adoption of [basic] cable ready televisions by manufacturers and consumers supports the theory that but for the illegal tie, other manufacturers would fill the void in the cable box market and the benefits of competition would ensue. It is clear that cable boxes are an economically viable product for manufacturers: Motorola and Scientific Atlanta have been manufacturing cable boxes for sale to BHN and other providers for years. (FAC ¶ 58). The only economic reason that these manufacturers would be willing to sell to BHN, but not to consumers, is that they are able to exclude competition and enjoy extra-competitive profits as a result of BHN's tying scheme. (FAC ¶ 61). As explained above, with regard to coercion, the brief advent of CableCARD did not materially (less than 1%) effect the competitive situation for cable boxes. However, the fact that other manufacturers tried to enter the market with CableCARD, further

demonstrates that there are in fact consumer electronics companies who wish to enter the cable box market, but have been prevented from doing so by BHN's gamesmanship with the necessary technology. (FAC ¶ ¶ 38, 45-47, 64).[8]

Because of the tie, and BHN's ability to manipulate the technology, BHN has returned to complete domination of the tied market.  Despite BHN having installed the tru2way technology on its cable systems, and despite the fact that BHN can now purchase tru2way cable boxes from manufacturers and lease those boxes to its premium cable customers, and despite the professed interest other consumer electronic manufacturers in manufacturing cable boxes for retail (FAC ¶ 65), consumers wanting to get the full value of the services for which they pay BHN do not have a choice but to lease their cable box from BHN. (FAC ¶ 66).  It is an issue of fact whether the lack of competing cable boxes is the result of BHN's conduct or the result of consumer electronics manufactures deciding to turn their collective backs on 96.9 million potential customers in a free market for cable boxes.  (FAC ¶ 45).

BHN relies upon Cancall PCS, LLC v. Omnipoint Corp., 2001 WL 29381 (S.D.N.Y. 2001) which found an insufficient showing of foreclosure in a tied market for handsets which worked with the defendants network because the plaintiff had failed to show that there was, or could be, competition in the market.  BHN fails to

---

[8] As recognized in Xerox Corp. v. Media Sciences Int'l, 511 F.Supp. at 387, manipulating changes in technology can be a useful tool to foreclose competition.  How BHN wielded that tool is a question of fact. Id.

note that <u>Cancall</u> was distinguished in <u>In re Wireless Tel. Svcs. Antitrust Lt.</u>, 2003 WL 21912603, * 8-9 (S.D.N.Y. 2003), and a motion to dismiss denied, because the pleading alleged that the tying arrangements had prevented entrance in the market and had a detrimental effect on competition in the tied market.[9]    In a market which is presently not competitive, it is an issue of fact whether competition will emerge once the illegal restraint is lifted.  <u>Geneva Pharm.</u>, 386 F.3d at 509-510.  Of the universe of consumer electronics products (televisions, game consoles, DVD players, computers, etc) cable boxes stand out as the one product which cannot be acquired by the consumer in a competitive market.  The FAC states facts supporting the very plausible inference that once the tying arrangement is removed, these manufacturers will enter the retail market and competition will ensue.  (FAC, ¶¶ 45, 65, 66).  BHN is not entitled to dismissal based upon its speculation that they will not.

---

[9] BHN also relied upon <u>Caniglio v. Highwood Servs., Inc.</u>, 495 F.2d 1286, 1291 (2d Cir. 1974), which was the basis of the <u>Cancall</u> decision.  <u>Caniglio</u> alleged a tying agreement arising from the requirement that purchases of regular season Buffalo Bills games also purchase tickets to pre-season games.  The court found that because Highwood had a monopoly on both regular season and pre-season tickets, there was no competition to be foreclosed in the tied market.  The case is clearly distinguishable in that BHN's power in the cable box market (in which BHN acts as a lessor, not a manufacturer) is created and exists only as a result of BHN's power to enforce its tie.

### G.      The Verizon v. Trinko Case Does Not Compel Dismissal.

Defendants rely upon Verizon Communications, Inc. v. Law Offices of Curtis v. Trinko, 124 S.Ct. 872 (2004) for the proposition that industries governed by FCC rules are somehow immune from anti-trust liability.   This proposition is not the holding of the case.   In fact, the opinion states the exact opposite. The Court recognized the issue of whether the existence of FCC regulations in the area complained of have any affect on the application of traditional anti trust law.   The Court stated, "To decide this case, we must first determine what effect (if any) the 1996 Act has upon the application of traditional antitrust principles."   The Court, however, rightly concluded that this question was easily answered by the plain language of the Act, which has a savings clause prohibiting any implied immunity from antitrust liability.   The Act states, "Nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the application of any of the antitrust laws."   47 U.S.C. § 152, quoted in Trinko, 124 S.Ct. At 878.

The Trinko case specifically does not reach the question of implied immunity from antitrust regulation because of the plain mandate of the statutory savings clause. Id.   Instead, the Court dismissed the case because the pleadings were insufficient to make out a monopolization, or attempt to monopolize claim under § 2 of the Sherman Act, 15 U.S.C. § 2, under the essential facilities doctrine, where regulations require

-38-

the access to essential facilities that § 2 claims under the essential facilities doctrine are supposed to redress.  Obviously, the case at bar is a tying claim, and the substantive analysis of the claims in <u>Trinko</u>, under either the refusal to deal claim, or the issues raised by the essential facilities doctrine in that case have no application in this case.

The cases BHN claims rely upon <u>Trinko</u>, for the proposition that tying cases cannot be brought where the industry is regulated do not stand for such a proposition. <u>The America Channel, LLC v. Time Warner Cable, Inc.</u>, 2007 WL 142173 (D.Minn. 2007) case is a § 2 claim brought under the essential facilities doctrine.  The holding as to a regulatory scheme affecting antitrust claims was tailored to those particular claims.  The Court held simply that the essential facilities doctrine under a § 2 claim, as opposed to a tying claim, where "State or federal regulatory agencies have effective power to compel sharing of the essential facility."  <u>The America Channel</u>, 2007 WL 142173 at * 9.  This is not a § 2 claim relying upon the essential facilities doctrine.  The cases relying upon <u>Trinko</u>, including <u>Southern Entertainment Television</u>, cited by BHN, rest upon the narrow holding that an essential facilities doctrine claim, which turns upon proof that access to a particular facility is effectively denied, cannot go forward when access is granted by regulation.  None of these

interests are implicated in this case, and Trinko, and cases relying upon it are not relevant.

In making an argument that antitrust laws are displaced by FCC regulations, Defendant has not even attempted to undertake traditional antitrust implied immunity analysis.  Defendant has not undertaken this approach because such would reveal that the reach of § 629 of the Telecommunications Act does not extend to granting cable operators immunity from antitrust regulation. "The law is that, "Implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." U.S. v. Nat'l. Ass'n of Sec. Dealers, Inc., 95 S.Ct. 2427, 2443 (1975), citing United States v. Phila. Nat'l. Bank, 83 S.Ct. 1715, 1733 (1963).  No such showing has been attempted because there is no "repugnancy" between the antitrust laws and § 629 or § 623 of the Communications Act.  In fact, far from being repugnant, the regulations and the antitrust laws both have the purpose of encouraging competition within the market for cable boxes.  Simply put, no showing has been made that cable providers enjoy and implied immunity from antitrust regulation because no such immunity exists.

## CONCLUSION

For the foregoing reasons, BHN Cable, Inc.'s Motion to Dismiss the First Amended Complaint should be denied.

-40-

Respectfully Submitted,

s/ Brian M. Clark
Brian M. Clark
Dennis Pantazis

**OF COUNSEL**:
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone: 205-314-0500
Attorneys for Karen Ann Ishee Parsons

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 7, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Samuel H. Franklin
Wesley B. Gilchrist
Lightfoot, Franklin & White, L.L.C.
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
Telephone: 205-581-0700

Bruce D. Sokler
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo P.C.
701 Pennsylvania Avenue NW, Suite 900
Washington, DC 20004
Telephone: 202-434-7303

Robert Kidwell
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo P.C.
701 Pennsylvania Avenue NW, Suite 900
Washington, DC 20004
Telephone: 202-434-7303

s/ Brian M. Clark
Of Counsel