FILED

2010 Feb-23  AM 10:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **KAREN ANN ISHEE PARSONS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action Number |
| vs. ) | **2:09-cv-0267-AKK** |
| ) | |
| **BRIGHT HOUSE NETWORKS,** ) | |
| **L.L.C.,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

## I.  BACKGROUND

This case arises under this court's federal question jurisdiction. 28 U.S.C.

§§ 1331, 1337.  Plaintiff Karen Ann Ishee Parsons ("plaintiff"), on behalf of

herself and the Members of the Class,[1] brings a claim under § 1 of the Sherman

---

[1]The Amended Complaint defines the Class as:

All persons in the United States who subscribed to [defendant] for Premium Cable Services and paid a monthly rental fee for an accompanying cable box.

Excluded from the Class are [defendant's] customers who receive service at an address at which they may receive cable television service from at least one competing cable or fiber optic vide service provider in addition to [defendant]; however, this exclusion shall only apply as of the date such competing service became available and does not defeat such class members' right to a remedy for injuries suffered prior to the existence of such competition.

Excluded from the Class are [defendant's] officers, directors or employees of [defendant]; any entity in which [defendant] has a controlling interest; the affiliates, legal representatives, attorneys, heirs, or assigns of [defendant]; and any federal, state, or local governmental entity, and any judge, justice, or judicial

Act.  15 U.S.C. § 1.

Defendant Bright House Networks, LLC ("defendant"), a cable service provider sometimes referred to as a cable multichannel video programming distributor ("MVPD"), provides cable service to customers in the following areas: Cantonment, Florida; Defuniak Springs, Florida; Central Florida (Orlando); Tampa Bay, Florida; Birmingham, Alabama; Elmore County, Alabama; Eufaula, Alabama; Bakersfield, California; Indianapolis, Indiana; and Metro Detroit, Michigan.  (Doc. 18 ¶¶ 7, 19).  Plaintiff is a resident of Alabama and a subscriber to defendant's "premium cable services," (*id.* ¶ 5), which she defines as:

> [T]hose cable video services, which are not available to customers by simply plugging a cable into a cable-ready television.  This definition includes all scrambled or otherwise secured video channels, as well as "pay per view" or "on demand" cable video programming, for which [defendant] charges fees other than the fee for basic cable, but may only be viewed through the use of a cable box.

(*Id.* ¶ 23).

According to plaintiff, "[c]ustomers desiring more choice in video programming [than offered by basic cable] can, for an additional monthly fee,

---

officer presiding over this matter and the members of their immediate families and judicial staffs.

(Doc. 18 ¶ 12).  Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in the court's record.

subscribe to [defendant's] Premium Cable Services and pay an increased monthly fee to [defendant]." (*Id.* ¶ 22). "Customers that pay for Premium Cable Services must also pay a rental fee to [defendant] for a cable box, sometimes referred to as a 'set-top box,' [which] allows the consumer to receive video signals and to navigate among the channels carried on a particular cable system [and] control[] the security features for premium channels," ensuring that customers only receive the services for which they have paid. (*Id.* ¶ 26). Some cable boxes have additional features, such as a Direct Video Recorder ("DVR"). (*Id.* ¶ 27). Defendant does not design or manufacture the cable boxes it rents to customers; it purchases them primarily from two providers, Scientific Atlanta and Motorola, Inc, who have contracts with defendant and who do not sell their cable boxes to the general public. (*Id.* ¶¶ 28-29). Plaintiff alleges that defendant's premium cable services are the "tying product" and that the cable box is the "tied product." (*Id.* ¶¶ 25, 27).

Plaintiff alleges that defendant has coerced its premium cable service customers to rent a cable box from it. Specifically, plaintiff alleges that, prior to July 1, 2007, defendant refused to provide premium cable services to customers unless they also rented a cable box from it. (*Id.* ¶ 31). To prevent this practice, in 1998, the Federal Communications Commission ("FCC") issued a regulation,

which became effective on July 1, 2007, requiring the cable industry to separate the security elements of cable box from the channel navigation elements to promote an open market for cable boxes.  (*Id.* ¶¶ 33, 35).  The security device developed to comply with the regulation is called "CableCARD."  (*Id.* ¶ 34).

Despite this regulation, plaintiff contends that defendant and other cable MVPDs have used their market power "to prevent the CableCARD from becoming an effective option for consumers who no longer wish to pay rental fees for cable boxes."  (*Id.* ¶ 38).  For example, allegedly defendant engages in the following practices to limit the desirability and functionality of CableCARDs: (1) representing on its website that customers may only obtain CableCARDs through it for a monthly rental fee, even though they are also manufactured by other companies; (2) charging a monthly fee that, bundled with other fees for a CableCARD, is "greater than the fees charged for a cable box;" (3) "not allow[ing] consumers to order advanced services such as pay-per-view events or premium sports packages;" (4) "not provid[ing] the channel guide services of cable boxes;" and (5) not enabling them "to provide two-way services such as the interactive program guide, or certain pay-per-view events."  (*Id.* ¶¶ 39-40, 42-43).  Moreover, defendant has purportedly implemented technology that impairs the utility of a CableCARD unless the customer also rents a cable box from defendant.  (*Id.* ¶ 45).

4

Consequently, "CableCARD technology has not been widely adopted or marketed by consumer electronic manufacturers." (*Id.* ¶ 44).

Plaintiff's Amended Complaint also contains a number of allegations with respect to the market for premium cable services and defendant's position within that market.  Plaintiff cites the FCC's most recent annual report that "as of 2005, there were approximately 96.9 million subscriptions for Premium Cable Services sold by cable MVPDs . . . in the United States [and that defendant] is the sixth largest MVPD in the country." (*Id.* ¶ 24).  Plaintiff further explains that "Cable MVPDs, including [defendant], do not normally compete against each other, but operate in geographically divided local markets" thus providing them with "*de facto* monopoly power" in many operating areas.  (*Id.* ¶ 48).  According to plaintiff, defendant provides cable services to "millions of customers" and "a substantial portion" of those customers have upgraded to premium cable service. (*Id.* ¶¶ 68-69).  Plaintiff alleges that defendant's  ability to raise its prices for the last four years, despite the poor economy, clearly demonstrates its market power. (*Id.* ¶ 57).

Plaintiff further alleges that non-cable competition is limited and therefore not an adequate direct substitute for cable MVPDs:

According to the Thirteenth Annual Assessment of the Status of

Competition in the Market for the Delivery of Video Programming, issued by the FCC on January 19, 2009 (the "FCC Assessment"), although video programming is distributed by means other than cable, most notably broadcast and satellite services, cable MVPD is the dominant force in the market, and enjoys a nationwide market share of almost 70%. A Congressional research report in 2007 found that cable controlled 69% of the nationwide MVPD market, compared to 27.7% for direct satellite transmission. Moreover, any nationwide statistic on cable vs. Satellite MVPD competition under-represents [defendant's] competitive position in the markets in which it chooses to do business, in that satellite MVPD services are available in areas in which no cable television service is available. Conversely, in urban areas, the physical requirements required to receive satellite MVPD services (an external surface with a clear sight line to the sky on which to attach a satellite dish) are harder to find, and often specifically foreclosed to tenants and apartment owners by landlords and/or condominium or cooperative rules. The difficulty in meeting the physical requirements for receiving satellite MVPD services further limits the competitive pressure of satellite services upon cable services. Thus, a 2005 general accounting office ("GA") study found that satellite MVPD market penetration was only 13% in urban areas, compared to 29% in rural areas.[2]

(*Id.* ¶ 50). Allegedly, cable MVPDs enjoy another competitive advantage

unavailable to satellite providers – the ability to "bundle" cable services with

phone and internet services (*Id.* ¶ 51). Furthermore, competitors purportedly face

high entry barriers in the form of costs for constructing a parallel cable system,

obtaining licenses from local franchises authorities, accessing multi-family

---

[2]Plaintiff acknowledges that fiber optic phone facilities may provide a viable threat to incumbent cable MVPDs, but alleges that such services are currently only available to a very limited number of consumers. Consumers to whom such services are offered are excluded from the Class. (Doc. 18 ¶¶ 12, 56).

dwellings such as apartments, and obtaining programming rights to popular channels.  (*Id.* ¶ 54).  Finally, incumbent MVPDs often enjoy an advantage in that customers switching to a different provider must invest time and money in set-up and new equipment.  (*Id.* ¶ 52).

Plaintiff contends that the tying arrangement creates anti-competitive effects.  Specifically, plaintiff alleges that the cable MVPDs' market power and their relationship with the two suppliers of cable boxes have prevented the development of a competitive market for cable boxes.  (*Id.* ¶¶ 58-66).  In addition, plaintiff alleges that "the rental fees that the Class is forced to pay for the cable boxes supplied by [defendant] exceed the cost of the cable box," which plaintiff estimates has a useful life of three to five years.  (*Id.* ¶ 67).

Based on these factual allegations, plaintiff alleges that defendant is liable for unlawful tying of its premium cable services and rental of its cable boxes in violation of § 1 of the Sherman Act.  (*Id*. ¶¶ 72-81.)

## II.  MOTION TO DISMISS STANDARD

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court "must accept the allegations set forth in the complaint as true." *Gonzalez v. McNary*, 980 F.2d 1418, 1419 (11th Cir. 1993) (citations omitted); *see also Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (per

curiam).  "Evaluating the sufficiency of a complaint is not a 'fact-based' question

of law. . . ."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1947 (2009).  According to the

Eleventh Circuit,

> [T]he complaint's "[f]actual allegations must be enough to raise a
> right to relief above the speculative level."  *Bell Atlantic Corp. v.*
> *Twombly*, 550 U.S. 544, [545] (2007); *see also Watts v. Florida Int'l*
> *Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).  "The Supreme Court's
> most recent formulation of the pleading specificity standard is that
> 'stating such a claim requires a complaint with enough factual matter
> (taken as true) to suggest' the required element."  *Watts*, 495 F.3d at
> 1295 (quoting *Twombly*, [550 U.S. at 556]).  This rule does not
> "impose a probability requirement at the pleading stage."  *Twombly*,
> [550 U.S. at 556].  Instead, the standard "simply calls for enough fact
> to raise a reasonable expectation that discovery will reveal evidence"
> of the required element.  *Id*.  "It is sufficient if the complaint succeeds
> in 'identifying facts that are suggestive enough to render [the
> element] plausible.'"  *Watts*, 495 F.3d at 1296 (quoting *Twombly*,
> [550 U.S. at 556]) (alteration in original).

*Rivell*, 520 F.3d at 1309-10.

"Antitrust complaints are subject to the liberal pleading requirements of the

federal rules, and, at a minimum, the complaint must give the defendant fair notice

of what the plaintiff's claim is and the grounds upon which it rests."  *Amey, Inc. v.*

*Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1500 (11th Cir. 1985) (internal

quotations and citations omitted).  Yet, "Rule 12(b)(6) dismissals are particularly

disfavored in fact-intensive antitrust cases."  *Spanish Broad. Sys. v. Clear Channel*

*Commc'ns*, 376 F.3d 1065, 1070 (11th Cir. 2004) (citations omitted).  Moreover,

8

"'summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.'" *Amey*, 758 F.2d at 1502 (quoting *Norfork Monument Co. v. Woodlawn Mem'l Gardens*, 394 U.S. 700, 704 (1969)).

## III.  DISCUSSION

### A.    Failure To State A Claim Upon Which Relief May Be Granted

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" *Amey*, 758 F.2d at 1502 (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)).  However, "[n]ot all tying arrangements violate section 1 of the Sherman Act." *Id.* (citations omitted).

Defendant contends that plaintiff's First Amended Complaint does not allege sufficient facts such that Plaintiff's tying claim is plausible on its face, as required by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  The court disagrees[3] and finds that plaintiff

---

[3]The court notes that at least three Multidistrict Litigation actions are currently pending: *In re Set-Top Cable Television Box Antitrust Litig.*, MDL No. 1995, 589 F. Supp. 2d 1379 (J.P.M.L. 2008)(Time Warner Inc. and Time Warner Cable Inc.); *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, MDL No. 2034, 626 F. Supp. 2d 1353 (J.P.M.L. 2009); and *In re Cox Enterprises, Inc., Set-Top Cable Television Box Antitrust Litig.*, MDL No. 2048, 626 F. Supp. 2d 1343 (J.P.M.L. 2009).  "All actions allege that [the cable television service

satisfies the Eleventh Circuit's elements for a tying claim under § 1 of the

Sherman Act:

> An illegal tying arrangement has five elements: (1) "a tying and a tied
> product"; (2) "evidence of actual coercion by the seller that in fact
> forced the buyer to [purchase] the tied product"; (3) that the seller
> have sufficient market power in the tying product market to force the
> buyer to accept the tied product; (4) "anticompetitive effects in the
> tied market"; and (5) "involvement of a 'not insubstantial' amount of
> interstate commerce in the tied product market." *Yentsch v. Texaco,*
> *Inc.*, 630 F.2d 46, 56-57 (2d Cir. 1980). *See generally Jefferson*
> *Parish*, 466 U.S. 2, 104 S. Ct. 1551 [1984].

*Amey*, 758 F.2d at 1502-03. As shown below, plaintiff's First Amended

Complaint sufficiently alleges each element of a tying claim to survive a motion to

dismiss.

### 1. Two Separate Products – a "Tying" Product and a "Tied" Product

Plaintiff alleges that defendant's premium cable services is the tying product

and the cable box is the tied product. (Doc. 18 ¶¶ 25, 27). She contends that these

two products are "separate and distinct." (*Id*. ¶¶ 28, 76). Defendant, on the other

hand, argues that "cable set-top boxes have traditionally been an integrated

component of unitary 'cable service' that included both television programming

---

provider] improperly tied and bundled the lease of cable boxes to the ability to obtain premium
cable services in violation of Section 1 of the Sherman Antitrust Act." *Set-Top Cable Television*
*Box*, 589 F. Supp. 2d at 1379; *see also Comcast Corp. Set-Top Cable Television Box*, 626 F.
Supp. 2d at 1353; *and Cox Enterprises, Inc., Set-Top Cable Television Box*, 626 F. Supp. 2d at
1343. The court finds that the pendency of these MDL actions severely undermine defendant's
argument that plaintiff cannot state a tying claim.

and the equipment necessary to view it" and that only through the recent federal regulatory regime "has there been any suggestion that cable service and set-top boxes *might one day become* separate products."  (Doc. 23 at 16-17) (emphasis in original).

To determine whether "two products are separate for tying analysis" the court looks to whether "there are two separate markets for the product." *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1574 (11th Cir. 1991) (citing *Jefferson Parish*, 466 U.S. at 21) (concluding that the market for multilist services was separate from the market for professional real estate services).  The court looks to the buyer's perspective to determine whether two independent transactions have occurred.  *Jefferson Parish*, 466 U.S. at 20.   Some of the factors to consider are "billing practices, consumer preferences, and the realities of similar markets."  *Thompson*, 934 at 1575.

Plaintiff alleges that, from the consumer's point of view, defendant's premium cable service is separate from the mechanism required to view it, *i.e.* the cable box.  Subscribers pay a fee for cable television and a *separate* rental fee for the cable box.  (Doc. 18 at ¶ 26).[4]  In addition, defendant's customers may select

---

[4]The fact that the defendant prices the cable service separate from the cable box indicates that it too views the two products as separate.

cable boxes with different features, (*id.* ¶ 27), further suggesting to this court that cable consumers view the set-top box as a separate product.  Finally, plaintiff alleges that defendant does not design or manufacture the set-top boxes but rather purchases them from two independent suppliers, (*id.* ¶¶  28-29), which raises a plausible claim that an independent market exists for the set-top boxes.

Furthermore, defendant's argument that the products are not separate because there is a functional relationship between the cable television programming and the set-top box required to view it lacks merit.  As the Supreme Court recognized in *Jefferson Parish*, "We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices."  466 U.S. at 19 n.30.  *See also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 463 (1992) (rejecting argument that there could be no separate market for camera parts and camera service because the two are often linked).   Consequently, the court finds that plaintiff's Amended Complaint sufficiently alleges that premium cable services and cable boxes are two separate products.

### 2.  *Buyer Was Forced to Buy the Tied Product to Get the Tying Product*

To plead a successful illegal tying claim, the plaintiff must allege "actual coercion by the seller that in fact forced the buyer to [purchase] the tied product."

*Amey, Inc.*, 758 F.2d at 1503 (citations omitted).  The coercion need not be fully effective to establish a *prima facie* case.  *See, e.g.*, *Eastman Kodak Co.*, 504 U.S. 451 (finding sufficient evidence of a tie between camera service and parts when Kodak took steps to limit the availability of parts to independent repair services even though some independent organizations remained in business, suggesting that Kodak's coercion was not fully effective).

Plaintiff alleges that, prior to July 1, 2007, defendant would not provide premium cable services unless customers also rented a cable box from the defendant.  (Doc. 18 ¶ 31).  Defendant counters that because its customers have had the option of purchasing or renting CableCARDs from other manufacturers since July 1, 2007, there is no tying problem.  (Doc. 23 at 29-31).  Plaintiff alleges, however, that defendant continues to coerce its customers to rent a cable box by: (1) representing to customers that CableCARDs are only available through the defendant for a monthly fee even though other companies manufacture CableCARDs; (2) charging higher fees for CableCARDs than cable boxes; and (3) limiting the effectiveness of CableCARDs, which are not enabled to show pay-per-view programs, do not provide a channel guide service, and do not have two-way capabilities.  (Doc. 18 ¶¶ 39-42).  The court finds that plaintiff's Amended Complaint sufficiently alleges that defendant coerced plaintiff to rent the cable

box to receive premium cable services.

### 3. Seller Had Sufficient Market Power in the Tying Product Market to Force the Buyer to Accept the Tied Product

Plaintiff must further allege that defendant has "sufficient market power in the tying market to force [her] to accept the tied product." *Amey, Inc.*, 758 F.2d at 1503. "Markets are defined in terms of two separate dimensions: products and geography." *Thompson*, 934 F.2d at 1572. First, the market must be defined; then, the court must consider whether the defendant "had enough power within the marketplace to abuse its position." *Id.*

### a. The Products Market

The products market is defined by "the availability of substitutes to which consumers can turn in response to price increases and other existing or potential producer's ability to expand output." *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 423 (11th Cir. 1984) (citations omitted). All products "that have reasonable interchangeability" occupy the same relevant market. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). Plaintiff defines the products market – premium cable services – as "those cable services, which are not available to customers by simply plugging into a cable-ready television . . . [including] all scrambled or otherwise secured video channels, as

well as pay per view or on demand cable video programming, for which [defendant] charges fees other than the fee for basic cable." (Doc. 18 ¶ 23).

Defendant argues that plaintiff fails to address the substitute products for defendant's premium cable services, such as those provided by satellite carriers, video rental services, telephone companies, and broadcast television stations. (Doc. 23 at 22-23). But plaintiff's Amended Complaint pleads sufficient facts to establish that differences exist between the defendant and non-cable providers that offer services most similar to the defendant's premium cable services. With respect to satellite services, plaintiff alleges that: (1) defendant claims to offer superior service and reliability over satellite providers; (2) satellites may only be installed on an external surface with a clear sight line to the sky, which may be unavailable in urban areas or banned by multi-family dwellings such as apartments; and (3) unlike satellite providers, cable service providers such as defendant can "bundle" its MVPD services with broadband internet access and phone service. (Doc. 18 ¶¶ 50-51, 53).[5] Consequently, the court finds that the Amended Complaint sufficiently alleges a relevant product market and addresses

---

[5]Although plaintiff concedes that telephone companies offering MVPD services through fiber optic vide facilities may be a "viable threat to [defendant's] market power," plaintiff further alleges that "[t]hese services have not previously been commercially available to consumers on a widespread basis" and thus have a very limited competitive influence. (Doc. 18 ¶ 56). Moreover, plaintiff expressly excludes from the Class customers with access to a fiber optic vide facility. (Doc. 18 ¶ 12).

direct substitutions in that market.

    b.    *The Geographic Market*

The geographic market is "the area in which the product or its reasonably interchangeable substitutes are traded." *L.A. Draper*, 735 F.2d at 423. In determining the relevant geographic market, the court must consider the "economic and physical barriers to expansion" as well as "[t]he location and facilities of other producers and distributors." *Id.* (internal quotations and citations omitted). The plaintiff alleges that the relevant geographic market is defined by defendant's local franchises, which defendant holds in certain parts of Florida, Alabama, California, Indiana, and Michigan. (Doc. 18 ¶ 7). Moreover, because, according to plaintiff, the local franchises generally exclude other cable service providers from the areas in which defendant operates, (doc. 18 ¶ 7), the franchise areas are an appropriate geographic market. *See N.Y. Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp. 802, 807-08 (S.D.N.Y. 1986) (defining geographic area by the boundaries of an exclusive franchise for purpose of antitrust claim under § 2 of the Sherman Act). The court finds that the Amended Complaint sufficiently pleads the existence of a relevant geographic market.

c.    *Market Power within Defined Market*

Plaintiff alleges several facts indicating that defendant faces minimal

competition, and has substantial market power, in the areas in which it operates:

(1) defendant's market power has enabled it to raise prices for the last four years,

despite the poor economy, (doc. 18 ¶ 57); (2) a January 19, 2009 FCC Assessment

alleged that cable MVPDs, including the defendant, enjoy a 70% market share for

basic and premium cable services (doc. 18 ¶ 50); and (3) competitors face high

barriers to entry, including the high cost of constructing a parallel cable system,

obtaining exclusive local franchising rights, and obtaining exclusive programming

rights to popular channels.  (Doc. 18 ¶  50).  Even assuming that non-cable

providers of subscription television services, such as satellite providers, operate

within the same product market, plaintiff also alleges that defendant maintains a

substantial majority of the customers receiving subscription television services

even when such providers are taken into consideration.  (*Id*. ¶ 50).  Plaintiff has

thus sufficiently alleged that defendant has enough economic power in the cable

television market to make it capable of coercing customers to rent a cable box to

receive premium cable services.

### 4.  *Anticompetitive Effects in the Tied Market*

Plaintiff is required to allege a link between defendant's "market power"

and "harm to competition in that market." *Spanish Broad. Sys.*, 376 F.3d at 1073. "Anticompetitive effects may be proven directly by control of prices or exclusion of competition." *Park v. Thompson Corp.*, No. 05-2931, 2007 WL 119461, at *8 (S.D.N.Y. Jan. 11, 2007).

The Amended Complaint properly pleads a link between defendant's market and harm to competition. Plaintiff alleges that, prior to July 1, 2007, defendant conditioned provision of its premium cable services on its customers' agreement to rent a cable box from it and that, consequently, it prevented competitors from entering the cable box market and induced consumers to pay rental fees exceeding the true value of the box. (Doc. 18 ¶¶ 60, 64, 66-67). Even after July 1, 2007, plaintiff alleges that defendant has effectively excluded competition by representing to its customers that CableCARDs are only available through defendant and only on a rental basis (exceeding fees charged by defendant for cable boxes), and by severely limiting the effectiveness of CableCARDs. (*Id.* ¶¶ 39-41, 65.) Finally, plaintiff alleges that these practices have prevented willing manufacturers from effectively competing in the cable box market. (*Id.* ¶¶ 64-66.) These allegations are sufficient to allege anticompetitive effects in the tied market.

### 5. Involvement of a "Not Insubstantial" Amount of Interstate Commerce in the Tied Product Market

Finally, plaintiff must plead facts demonstrating that "a 'not insubstantial' amount of interstate commerce" is involved. *Amey, Inc.*, 758 F.2d at 1503. This element is easily met. According to the Amended Complaint, defendant provides cable services to millions of customers, (doc. 18 ¶ 68), and that "[a] substantial portion of [defendant's] subscribers have upgraded from basic cable to . . . Premium Cable Services, and therefore rent cable boxes from [defendant]." (*Id*. ¶ 69.) These allegations are sufficient to plead a "not insubstantial" effect on interstate commerce. *See Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969) ("[N]ormally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie, for . . . it is unreasonable, per se, to foreclose competitors from any substantial market by a tying arrangement . . . .") (internal quotations and citation omitted); *see also Thompson*, 934 F.2d at 1578 (noting that the Eleventh Circuit has held that $325.00 is insubstantial but that $10,091.07 is not). The court therefore determines that plaintiff properly pleaded facts establishing that the case involves a "not insubstantial" effect on interstate commerce.

**B.**    ***Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP* Is Inapplicable**

Defendant contends that dismissal of the Amended Complaint is warranted in light of *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, L.L.P.*, 540 U.S. 398 (2004): "[G]iven the regulatory regime that governs cable operators' provision of set-top boxes, the Supreme Court's admonition in [*Trinko*], that antitrust laws not be applied to duplicate or second-guess the efforts of a regulator that already asserts control over competition in a regulated market requires dismissal of the Plaintiff's Sherman Act claim with prejudice." (Doc. 22 at 2). Defendant further argues:

> As described above, Congress and the FCC have taken responsibility for establishing clear goals and a timeline for creating a third-party set-top box market, and regulating cable operators' particular practices with regard to the sale and rental of set-top boxes. The enactment of § 629 of the Communications Act and the FCC's plug and play rules, which include extraordinarily granular technical requirements and are related to other similar FCC-administered requirements for manufacturers of televisions, tuners, set-top boxes, and electronic retailers, were intended to directly address the issue of set-top box competition and related practices. This is just the sort of "regulation [that] significantly diminishes the likelihood of major antitrust harm" that the Supreme Court addressed in *Trinko*. *Trinko*, 540 U.S. at 412. . . .

> To be clear, [defendant] does not suggest that the Supreme Court's holding in *Trinko* generally bars application of the antitrust laws to cable providers simply because they are regulated by the Communications Act and the FCC's rules. . . . But where, as here,

> Congress has taken upon itself the task of eventually creating a new
> market for set-top boxes, and where, as here, the FCC's rules dictate
> in all respects the manner and scope, and timing of the creation of that
> new market, *Trinko* makes clear that the antitrust laws have nothing
> to add to the process.

(Doc. 23 at 44-45).

This court rejects defendant's reading of *Trinko*.  In *Trinko*, the plaintiff

brought a claim under § 2 of the Sherman Act, arguing that Verizon failed to fulfill

orders of rival carriers in violation of a detailed regulatory scheme enacted by

Congress.  540 U.S. at 404-05.  The Court found that the legislation at issue did

not foreclose antitrust claims.  Nevertheless, the Court ruled that the plaintiff

failed to state a claim under traditional antitrust principles because plaintiff's

claim would not have existed in the absence of the legislation – prior to the

legislation, Verizon had no obligation to share its facilities with its competitors.

*Id.* at 406-11.

Here, plaintiff's antitrust claim would exist even absent the FCC's

regulation requiring cable companies to decouple the security and navigation

features of cable boxes.  Consequently, *Trinko* is distinguishable and its reasoning

is inapplicable.  The court notes also that the United States District Court for the

Western District of Oklahoma recently addressed this precise issue and similarly

determined that *Trinko* is inapplicable.  *In re Cox Enterprises, Inc., Set-Top Cable*

*Television Box Antitrust Litig.*, Order, MDL No. 2048, at 9-10 (J.P.M.L. Jan. 19, 2010).  Given the striking similarity between the arguments raised in that court and this one, the court finds the opinion persuasive.  The court therefore declines to apply *Trinko* to preclude plaintiff's claim at this early stage of the litigation.

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that plaintiff's First Amended Complaint sufficiently alleges each element of a tying claim and thus states a claim for which relief may be granted.  Therefore, defendant's Motion to Dismiss First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) is denied.

DONE this 23rd day of February.


_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE